CITY OF MEDFORD *vs.* MARINUCCI BROS. & CO., INC.
& another.

Middlesex.    December 6, 1961. — April 3, 1962.

Present: WILKINS, C.J., SPALDING, WILLIAMS, WHITTEMORE,
& SPIEGEL, JJ.

*Zoning,* Property of the Commonwealth, Preëxisting nonconforming use,
Railroad. *Commonwealth,* Local regulations, Public works. *Contract,*
For construction of public works. *Building Laws. Public Works.*
*Abandonment. Railroad,* Zoning.

Activities of the Commonwealth or its agents in the furtherance of a public
project on its own land are not subject to the local zoning ordinance or
by-law, even though the Zoning Enabling Act, G. L. c. 40A, does not
contain a provision exempting such activities from its application.
[54–56]
Activities of a contractor, on land of the Commonwealth, reasonably neces-
sary for the performance of a contract with the Commonwealth for a
public project are exempt from the local zoning ordinance or by-law.
[56–57]
Construction and operation by a contractor on land of the Commonwealth
of hoppers for the purpose of receiving, storing, or conveying fill
dropped from railroad freight cars on a track above were reasonable
and necessary to performance by the contractor of a contract with the
Commonwealth to fill nearby land for the construction of a new high-
way, even though many truck trips daily could have carried the fill to
the construction site over existing public highways; and activities in
connection with the hoppers were exempt from the local zoning ordi-
nance.   [57]
Apart from the exemption from municipal building codes afforded by
G. L. c. 143, § 3, as amended, to "buildings and other structures . . .
owned or occupied by" the Commonwealth, hoppers constructed below
railroad tracks to receive fill dropped from freight cars, together with
their appurtenances, located on land of the Commonwealth and used by
a contractor in performance of a highway building contract with it were
not subject to the local building code.   [57–58]
A contract with the Commonwealth for a public project which requires
the contractor to comply with municipal ordinances and regulations
should not be interpreted as requiring the contractor to comply with
them in performance of the contract on land of the Commonwealth.
[58]

Unloading fill from railroad cars on land of the Commonwealth in aid of the construction of a highway by the Commonwealth was not subject to the local zoning ordinance. [59]

The fact that an interstate railroad never sought nor received from the Interstate Commerce Commission a certificate for the abandonment of a line over which no trains ran for a period conclusively indicated that there had not been a concurrence of an intent to abandon on the part of the railroad and a voluntary act carrying the implication of abandonment so as to effect an abandonment of a use of the line for trains protected under the Zoning Enabling Act, G. L. c. 40A, and under the local zoning ordinance as a preëxisting nonconforming use. [59–60]

A contention of a city in a suit in equity that a previous use of certain railroad land only for the passage of trains over it had been "enlarged" to the extent of effecting a use different in kind not protected under the Zoning Enabling Act, G. L. c. 40A, and under the local zoning ordinance as a preëxisting nonconforming use, was without merit where it appeared merely that a single siding was established on the land where trains stood or were coupled and that there was but one train at a time and but three trains a day. [60–61]

BILL IN EQUITY, filed in the Superior Court on April 21, 1961.

The suit was reported by *Pecce, J.*, on the pleadings and an agreed statement of facts.

*Mark E. Gallagher, Jr.,* City Solicitor, for the plaintiff.

*James F. Sullivan,* for the defendant Marinucci Bros. & Co., Inc.

*Richard J. Mulhern,* for the defendant Boston and Maine Railroad.

WILKINS, C.J. The defendant Marinucci Bros. & Co., Inc. (Marinucci) has a contract dated September 20, 1960, with the Commonwealth, acting through the Department of Public Works, for building a section of Interstate Highway 93, which is to run from New Hampshire to Boston and is being built in sections. Marinucci is to construct a bridge and ramp with an eight-lane roadway across the Mystic River (St. 1960, c. 541) south of Riverside Avenue and Medford Square and, after relocating the river, to extend the roadway over new filled land to a point near the Somerville line. The contract was to be completed within two and one-half years, and requires 3,000,000 cubic yards of fill. For this project the defendant Boston and Maine Railroad is transporting fill from Madbury, New Hampshire, to two hoppers or vaults on its Medford branch at the site of

the former Cross Street railroad bridge not far from Medford Square. By this bill in equity the city of Medford seeks (1) to enjoin Marinucci from constructing, operating, using or maintaining the hoppers for the purpose of receiving, storing, or conveying fill; and (2) to enjoin the railroad from delivering, transporting, or dumping fill by use of its trackage and equipment. The facts appear in a case stated. The case is reported without decision by a judge of the. Superior Court.

The railroad transports the fill under tariffs filed with the Interstate Commerce Commission and does so in train load lots of approximately forty cars. There are about three loaded and three empty train movements daily except Sundays between Medford and Madbury.

The Medford branch was constructed pursuant to Sp. St. 1845, c. 109. For many years there were two tracks extending to Main Street from the railroad's Portland district western route main line. In 1925 its terminus was cut back to Riverside Avenue near Medford Square, and in 1934 the second line of track was removed. It has since operated as a single track road, exclusive of side, passing, and terminal tracks. Passenger service was discontinued about October 1, 1957. In 1958 the railroad was authorized to move its freight depot from Medford Square to a point east of the portion of the Medford branch concerned in this case. G. L. (Ter. Ed.) c. 160, § 129. In 1958 the Commonwealth by eminent domain took that part of the railroad's right of way east of Riverside Avenue and other land on either side thereof for the construction of Interstate Highway 93. In February, 1959, the railroad removed all tracks to the west of the easterly end of that taking.

Marinucci received permission from the chief engineer of the Department of Public Works and the "Federal Roads Engineer" to occupy part of an area assigned to another contractor "for the purposes of constructing a railroad loading area." This area was at the site of the former railroad bridge at Cross Street and is part of the land taken for Interstate Highway 93. It was never used as a

freight depot or as a railroad loading or unloading area, but served only for the passage of trains. Marinucci removed fill placed by the other contractor, and excavated to a depth of eighteen feet below the grade of the tracks and constructed two rectangular vaults or hoppers with twelve inch concrete walls. Over the hoppers the railroad laid a line of track which continued westerly across the land taken for Interstate Highway 93 to the limit of its own land. At the same time it laid a fifty-car side track extending westerly on its right of way to a point on the State land beyond the hoppers.

Two gondola cars are unloaded simultaneously. The fill is dropped from the cars through doors in the floors onto a conveyer belt. Where necessary, a car shaker is used. The cars are seized from above by a ''shake-out'' hood, which is suspended from a steel frame twenty feet above each hopper, and are vibrated by electrical impulse until all impacted fill is dislodged. There is no requirement that the fill be brought in at this or any other point. The construction of the hoppers has eliminated an estimated 1,200 truck trips daily on the streets of Medford.

The hoppers and their appurtenances are located entirely within the layout of Interstate Highway 93 and within an area zoned for single residences. This single residence zone embraces the right of way from Spring Street to the land taken by the State. The right of way to the west of the State land is in an area zoned as a light industrial district. Neither the railroad nor Marinucci has applied for an ''occupancy permit'' under the zoning ordinance, nor has either applied for a building permit under the building code. On April 12, 1961, the building commissioner of Medford notified the contractor of alleged violations. Marinucci is the only customer served by the railroad at the hoppers.

The railroad has never sought nor received a certificate of public convenience and necessity from the Interstate Commerce Commission for the abandonment of any portion of its Medford branch between Spring Street and the for-

mer terminus at Riverside Avenue. See 41 Stat. 477–478; 54 Stat. 902; 49 U. S. C. § 1 (18) (19) (20) (1958). The fill placed at the location of the hoppers by the other contractor made it impossible "for a period of time," until removed by Marinucci, to operate trains across the location.

Shortly stated, the operations, of both the contractor and the railroad, which the city seeks to use its delegated powers to block, are temporary in character; are performed, by the contractor at least, on land owned by the Commonwealth; and are conducted in aid of a reasonably prompt construction of a public project as to which the contractor has made a contract with the Commonwealth. In addition, the operations of the railroad sought to be stopped are at the terminus of transportation in interstate commerce. The delegated powers upon which the city relies are its zoning ordinance, enacted pursuant to what is now G. L. c. 40A, and its building code, enacted pursuant to G. L. c. 143, § 3 (as amended through St. 1959, c. 607, § 2).

1. Viewed apart from their location on land owned by the Commonwealth, we assume that the hoppers and their appurtenances fall within the terms of the zoning ordinance in so far as there is established a single family residence district, and that the ordinance is within the scope of the Zoning Enabling Act, G. L. c. 40A. But we are of opinion that the ordinance has no present application to Marinucci on land of the Commonwealth.

The ordinance could not control action by the Commonwealth or by its agents, the Commissioners of Public Works, whose chief engineer authorized the construction of "a railroad loading area" at this location. In *Teasdale* v. *Newell & Snowling Constr. Co.* 192 Mass. 440, decided in 1906, the metropolitan park commissioners had made a contract with the defendant contractor for grading and other work on land in Quincy which they had taken for park purposes, and incidental thereto had voted that a stable should be temporarily placed upon the unfinished park. The board of health of Quincy brought a bill in equity to restrain the maintenance of the stable without a license from it pur-

suant to R. L. c. 102, § 69.[1]   See now G. L. (Ter. Ed.) c. 111,
§ 155.   On affirming a decree dismissing the bill, this court
said, through Hammond, J. (pp. 442–443): "In a word,
these parks are placed under the control of these commis-
sioners acting as the agents of the State in exercising the
authority of the sovereign over its own property.   As such
agents, performing the duty of making available for park
purposes the land in question, it is found reasonably neces-
sary for them to erect upon it and use this stable.   Such an
act must be regarded as needful in the proper execution of
the powers which the State may exercise over its own prop-
erty; and the general law made for the regulation of citi-
zens must be held subordinate to this special statute regu-
lating the use of the property of the State unless there is
express provision to the contrary.   It is not to be presumed
that the Legislature intended to give to the local licensing
board the authority to thwart the reasonably necessary
efforts of the park commissioners to perform their duty as
agents of the State."

The *Teasdale* case goes far in deciding the case before us.
This court has not been called upon to consider other cases
like it, but Attorneys General have often relied upon it in
their opinions, some of which we cite.   Rep. A. G. Pub. Doc.
12, 1942, p. 73 (Department of Conservation not required
to obtain licenses from local authorities to maintain pic-
nicking, camping, and log cabins, which it operates in State
parks and forests).   Rep. A. G. Pub. Doc. 12, 1944, pp. 47–
49 (Boston police have no authority over taxi stands at
Logan Airport).   Rep. A. G. Pub. Doc. 12, 1949, p. 29
(Commissioners of Public Works may erect a building for
the storage of machinery in a single residence district not-
withstanding a zoning by-law of a town).   Rep. A. G. Pub.
Doc. 12, 1958, pp. 60–61 (electric wiring in Commonwealth
Armory is not within jurisdiction of superintendent of
wires of city of Boston).   Rep. A. G. Pub. Doc. 12, 1958,

---

[1] "No person shall erect, occupy or use for a stable any building in a city
whose population exceeds twenty-five thousand unless such use is licensed by
the board of health of said city, and, in such case, only to the extent so
licensed."

p. 65 (inspector of wires in a municipality has no jurisdiction over installation of wiring in and on property of the Commonwealth).

Cases from other jurisdictions seem fairly uniformly to hold that a State is immune from municipal zoning regulations, absent statutory provision to the contrary. *Bloomfield* v. *New Jersey Hy. Authy.* 18 N. J. 237, 244–249. *Union Free Sch. Dist. No. 14 of Hempstead* v. *Hewlett Bay Park,* 198 Misc. (N. Y.) 932, 934, affd. 278 App. Div. (N. Y.) 706. *State* v. *Allen,* 158 Ohio St. 168, 174-175, cert. den. sub nom. *Balduff* v. *Ohio Turnpike Commn.* 344 U. S. 865. *Davidson County* v. *Harmon,* 200 Tenn. 575, 583–585. *Charleston* v. *Southeastern Constr. Co.* 134 W. Va. 666, 675–676. See *Atherton* v. *Superior Court of San Mateo County,* 159 Cal. App. 2d 417, 427–429; *Decatur Park Dist.* v. *Becker,* 368 Ill. 442, 447; *New Jersey Interstate Bridge & Tunnel Commn.* v. *Jersey City,* 93 N. J. Eq. 550, 553–554; *Aviation Servs. Inc.* v. *Board of Adjustment of Hanover,* 20 N. J. 275, 282; *Green County* v. *Monroe,* 3 Wis. 2d 196; McQuillin, Municipal Corporations (3d ed.) § 25.15; Rhyne, Municipal Law, §§ 12–8, 32–35.

Apparently as bearing upon the effect of the zoning ordinance, the city cites G. L. c. 143, § 3 (as amended through St. 1959, c. 607, § 2). This section from the chapter relating to the regulation and inspection of "buildings and other structures" exempts from municipal regulation those which "are owned or occupied by the United States, or owned or occupied by the commonwealth or by any county." We shall again notice § 3 when we discuss the Medford building code. For the present we state our opinion that § 3 is without significance as an indication that the absence of similar exemptions in the Zoning Enabling Act affirmatively proclaims a legislative intent that the Commonwealth in its activities shall be subject to municipal zoning regulations. The forceful language of the *Teasdale* case and the many rulings of Attorneys General based upon it are not thus lightly to be set aside.

2. From what we have said, it follows that Marinucci in the performance of his contract on Commonwealth land

with the Commonwealth must likewise be exempt from the Medford zoning ordinance. The Commonwealth, as matter of common knowledge, does not have the employees or the equipment to construct all the roads and bridges which a modern highway system requires. It must act through others, and a contract with Marinucci was the method chosen to construct that portion of Interstate Highway 93 which now concerns us. We cannot conclude that by enacting the Zoning Enabling Act the Legislature intended to authorize a municipality to thwart the Commonwealth in carrying out the functions of government. When the Legislature has intended to confer a municipal veto upon action by the Department of Public Works, it has done so in unmistakable terms. See St. 1961, c. 590, § 4.

In an effort to escape the implications of the *Teasdale* case the city argues that the operation of the hoppers, while possibly efficient and convenient, is not "reasonably necessary." It stresses that an alternative trucking method is possible. But this method would send 1,200 trucks daily over the public highways of Medford. The mere statement of the argument carries its own refutation. The hopper operation is plainly reasonable and necessary, and it is utterly without consequence on this issue that there is no requirement in the contract that the fill be brought in at this or any other point, or that "There is no claim made that the contract could not be fulfilled in time or scope by the use of another method of securing land fill."

3. If we assume that each hopper and its appurtenances is a "structure" within the Medford building code (see especially § 10), they are, by analogy to what we have said, not subject to the code in carrying out a State project on land owned by the State. See *Hall* v. *Taft,* 47 Cal. 2d 177, 179–184; *Bloomfield* v. *New Jersey Hy. Authy.* 18 N. J. 237, 244–249; Rhyne, Municipal Law, § 12–8, 31 A. L. R. 450. This result is apart from the exemption "of buildings and other structures . . . owned or occupied by the commonwealth." G. L. c. 143, § 3 (as amended through St. 1959, c. 607, § 2). In addition, the cited statute declares a policy

which is controlling. The hoppers are vaults in the ground, title to which is in the Commonwealth. The appurtenances, including the conveyer belt and the "shake-out" hood, if not part of the real estate, nevertheless during the unloading operation are "occupied" by Marinucci in a broad sense as "agent" of the Commonwealth.

4. The contract between Marinucci and the Commonwealth calls for compliance with all municipal ordinances and regulations. The city is not a party to the contract, but no question under *Mellen* v. *Whipple,* 1 Gray, 317, is presented. As a matter of interpretation, it is clear that the contract did not contemplate compliance with municipal ordinances and regulations which would be otherwise inapplicable to the contractor on land of the Commonwealth, and which would frustrate, or even only hinder, performance of the contract. See *New Jersey Interstate Bridge & Tunnel Commn.* v. *Jersey City,* 93 N. J. Eq. 550, 552–554.

5. The railroad does not contend that, as such, so far as State law is concerned, it is not subject to the zoning ordinance while operating on its own property. See *Marinelli* v. *Board of Appeal of Boston,* 275 Mass. 169, 172; *Caires* v. *Building Commr. of Hingham,* 323 Mass. 589, 592, 597. It had made no application to the Department of Public Utilities to exempt its land from the operation of that ordinance as permitted by G. L. c. 40A, § 10 (as amended through St. 1954, c. 368, § 2). In this aspect its case rests upon the nonconforming use provision of the Zoning Enabling Act, G. L. c. 40A, § 5 (as amended through St. 1954, c. 368, § 2), and upon the ordinance, § 16 (a), which says that "any land which at the time of the adoption of this chapter . . . is being put to a non-conforming use may continue to be used for the same non-conforming purpose."

The city concedes that the railroad's right of way was a prior nonconforming use, but makes two contentions: (1) A "new operation" is being conducted, i.e., the nonconforming use has been "enlarged with a more complex apparatus and facilities," and its character has been changed. (2) There has been an abandonment, albeit involuntary.

6.   On abandonment (the second issue) reliance is placed upon the fact that the loading area had been filled in by a contractor other than Marinucci; that this had to be excavated by Marinucci in order to construct the hoppers; and that as a result the old railroad operation had become physically impossible prior to the commencement of the present operation.

We do not conclude that there was an abandonment. There are three parcels of land over which there are tracks: (1) The loading area on land of the Commonwealth. (2) The Medford branch to the east.   (3) The land to the west.

The loading area apparently is the only place to which the city directs its argument as to the necessity of removing fill placed by another contractor.   It is there that the process of transportation by the railroad comes to an end. It is there that the fill is dumped after opening doors in the floors of the cars and, if necessary, by using the "shake-out" hoods.   Except for moving the cars from time to time it is not clear from the agreed facts that the railroad does anything there.   Nothing indicates who opens the doors.   The rest of the operation at that place we infer must be performed by Marinucci, which installed the hoppers and their appurtenances, including the "shake-out" hood.   The entire unloading operation occurs on land of the Commonwealth in aid of the construction of Interstate Highway 93.   It is, therefore, not subject to the city's zoning ordinance.   It falls within the earlier discussion in this opinion, and the question of abandonment never arises as to this land.

We do not understand that the city contends that there has been an abandonment of the Medford branch east of the Commonwealth land.   In any event, as to this land and as to the small area west of the Commonwealth land, we regard as decisive, on the question of intent to abandon, the fact that the railroad never sought nor received a certificate for the abandonment of its line from the Interstate Commerce Commission.   See 41 Stat. 477–478; 54 Stat. 902, 49

U. S. C. § 1 (18) (19) (20) (1958).  Therefore, it does not appear that there was a concurrence of an intent to abandon and a voluntary act carrying the implication of abandonment.[1]  See *Pioneer Insulation & Modernizing Corp.* v. *Lynn,* 331 Mass. 560, 565.  See also *Paul* v. *Selectmen of Scituate,* 301 Mass. 365, 370; *Dobbs* v. *Board of Appeals of Northampton,* 339 Mass. 684, 685–687.

7.  As to the city's argument that the nonconforming use has been enlarged, most of the facts upon which it relies apply chiefly in the loading area on Commonwealth land and are of no avail.  These are that the railroad never deposited freight at the location of the hoppers, but merely ran trains over the area; that the railroad's operation is extensive and not consistent with normal passage over a right of way; that the railroad has to traverse the State taking; and that the character of the use differs materially, in that the makeup and breakup of trains, the standing of freight trains, and the delivery of freight (in this case fill) are incompatible with former use as a passage to a freight terminal.  We perceive no clear contention applicable to the Medford branch east or west of the State land.  If there be such a contention, the answer is that the operation is still railroad operation, and the nonconforming use still persists.  Assuming that the prior passage of trains would not support the establishment of a freight yard, the addition of a single siding is all that there is outside of the State land.  The distinction is between an increase in the amount of business, even a great increase, which does not work a change in use, and an enlargement of a nonconforming business so as to be different in kind in its effect on the neighborhood.  *Building Commr. of Medford* v. *McGrath,* 312 Mass. 461.  *Marblehead* v. *Rosenthal,* 316 Mass. 124, 128.  *Inspector of Bldgs. of Burlington* v. *Murphy,* 320 Mass. 207, 210.  *Seekonk* v. *Anthony,* 339 Mass. 49, 54.  *Wellesley* v. *Brossi,* 340 Mass. 456, 465.  Viewing the en-

---

[1] Section 16 (c) of the Medford zoning ordinance reads: "When a nonconforming use has been discontinued for a period of one year it shall not be reëstablished and future use shall be in conformity with this chapter." The one year period had not begun to run.

tire operation outside of the State owned land, the chief difference emphasized is that trains stand and are coupled on a siding instead of passing over the tracks. There is but one siding, but one train at a time, and but three trains a day. We are of opinion that this is not an enlargement of a nonconforming business so as to be different in kind in its effect on the neighborhood.

8. Having reached this conclusion under State law, we do not consider the serious question, to which the city makes no effective answer, that there is an unwarranted attempt to interfere with interstate commerce in the prayer for an injunction against the operation of the Medford branch. See, for example, *Southern Pac. Co.* v. *Arizona,* 325 U. S. 761, 766–782; *Huron Portland Cement Co.* v. *Detroit,* 362 U. S. 440, 447–448.

*Bill dismissed with costs of appeal.*