NEW YORK CENTRAL RAILROAD COMPANY *vs.* DEPARTMENT OF PUBLIC UTILITIES & another.

Suffolk.    May 8, 1964. — June 4, 1964.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, KIRK, & SPIEGEL, JJ.

*Public Utilities. Zoning,* Public Utilities. *Railroad. State Administrative Procedure Act. Equity Pleading and Practice,* Review of decision of department of public utilities.

In a proceeding before the Department of Public Utilities by a railroad seeking an exemption of land from the operation of a zoning by-law under G. L. c. 40A, § 10, the department was required not only to consider the effect of the proposed facility upon the local community and upon persons living nearby, but also to weigh the public effects of the requested exemption in the State as a whole and upon the territory

---

served by the railroad, and to inquire whether the proposed facility would provide useful and economical service and benefits to shippers, consumers, industries and others, and whether and to what extent it would enhance the ability of the railroad, financially and otherwise, to perform its various public functions.   [592]

Upon an appeal under G. L. c. 25, § 5, as amended, from a denial by the Department of Public Utilities of a petition by a railroad under G. L. c. 40A, § 10, for exemption from the operation of the zoning by-law of a town of land in a general residence district which the railroad proposed to use for parking automobiles brought there by rail prior to their distribution to dealers, the department's findings of fact underlying its decision and its conclusion that it was "not persuaded that the public generally . . . [would] receive any benefit" from the proposed use were inadequate under § 11 (8) of the State Administrative Procedure Act, c. 30A, to guide this court on a review pursuant to the standards set forth in § 14 (8) of c. 30A, and the decision was vacated and the case remanded to the department for adequate subsidiary findings on each relevant issue, reopening the case for further testimony if desirable.   [592–594]

PETITION filed in the Supreme Judicial Court for the county of Suffolk on January 17, 1964.

The case was reserved and reported by *Cutter,* J., without decision.

*Richard J. Ferriter* for New York Central Railroad Company.

*Samuel Adams,* Assistant Attorney General, for the Department of Public Utilities.

*Joseph H. Lewis,* Town Counsel (*Harris Altman* with him), for the intervener, Town of Framingham.

CUTTER, J.   This is an appeal under G. L. c. 25, § 5, as amended, from a decision of the department denying (with two commissioners dissenting) the railroad's petition (filed August 26, 1963) for an exemption of certain land from the operation of the Framingham zoning by-law.   See G. L. c. 40A, § 10.[1]   The town has been permitted to intervene.

---

[1] Section 10 (as appearing in St. 1954, c. 368, § 2) reads, "A building . . . or land used or to be used by a public service corporation may be exempted from the operation of a zoning . . . by-law if, upon petition of the corporation, the department of public utilities shall, after public notice and hearing, decide that the present or proposed situation of the building, . . . .or land . . . is reasonably necessary for the convenience or welfare of the public." See *Wenham* v. *Department of Pub. Util.* 333 Mass. 15; *Medford* v. *Marinucci Bros. & Co.* 344 Mass. 50, 58.   Section 10 had its origin in St. 1920, c. 601, § 8, which became a part of G. L. c. 40, § 29.   The same material was later transferred to G. L. c. 40, § 26, by St. 1933, c. 269, § 1 (later amended by St. 1952, c. 438).   See 1953 House Doc. No. 2249, pp. 76, 91.   See also 1933

The railroad desires to use the land for parking automobiles, prior to their distribution, after they have been unloaded from railroad cars. Adjacent land is now similarly used and is also used for automobile unloading facilities. A plan based upon exhibits in evidence appears below. The particular

Senate Bill No. 433, p. 4. The 1933 act was based upon the report of the special commission revived by Res. 1932, c. 14. See 1933 House Doc. No. 1240, pp. 42–43, 64–65; 1932 House Doc. No. 41, p. 8. Compare the similar provision of the Boston zoning statute. See St. 1924, c. 488, § 22 (as amended through St. 1928, c. 70); *Marinelli* v. *Board of Appeal*, 275 Mass. 169, 172.

land (marked Fitts land and Temple land) for which exemption is sought (the locus) lies in an area zoned for general residence use between (1) a north-south boundary separating the residence zone from an industrial zone and (2) Hollis Street. The westerly boundary of the locus (near Hollis Street) and its northerly boundary (near Andrews Street) and its southerly boundary are shown on the annexed plan by a heavy black line. Certain land in the adjacent industrial zone to the east would also be used for automobile parking, if the exemption is granted, in addition to land in the industrial area now so used. All the proposed parking area and unloading facilities are owned by the railroad and lie to the west of the railroad's Milford branch, not far south of the junction of that branch with the main railroad line between Albany and Boston.

Hearings before the department were held in Boston and in Framingham. The commissioners took a view. The department on October 21, 1963, issued an order denying the railroad's petition in which the majority concluded that they were "not persuaded that the public generally will receive any benefit from . . . [the proposed] development." The majority found the following facts: "The railroad here seeks an exemption of . . . approximately ten acres of land now zoned for general residence. The land is bounded on the north by Andrews Street, on the west by Hollis Street and land along Hollis Street, and on the east by land of the railroad zoned for industry. The easterly boundary of the locus is 300 feet west of the Milford Branch of the railroad. Between the branch and the locus lies the railroad land which is zoned for industry. At the present time, part of the industrially zoned land is used as an unloading and storage point for automobiles hauled by rail into Framingham for further distribution over the highways to automobile dealers in the area." The majority then summarized certain railroad testimony in terms set out in the margin[2]

---

[2] "The pertinent evidence of the railroad . . . may be summarized . . .: The railroad believes that the Chrysler Corporation will ship . . . approximately 167 additional carloads per month, if suitable storage facilities can be made available at Framingham. The railroad proposes to use . . . ⅓ to ½ of the locus for this purpose. It is planned to black-top this area and to fence

New York Central Railroad v. Department of Public Utilities.

without otherwise making subsidiary findings of fact based upon that evidence. The majority went on to say, "The issue before us is whether the proposed use is reasonably necessary for the convenience or welfare of the public. The burden of proof is on the railroad to demonstrate that the public convenience or welfare will be served by the proposed use. We may not ignore the fact that . . . Framingham has zoned the locus as a general residence district, and an exemption should be granted only on the basis of a preponderance of evidence that the public convenience or welfare would be better served if the zoning by-law were not enforced . . . ." The majority then came to the conclusion already quoted.[3]

. . . [its] boundary . . . and a so-called [twenty-five foot] green belt . . . of bushes or trees is proposed as a buffer between the paved area and the residential non-railroad property. Additional lighting fixtures will be constructed by the railroad and a 24″ drainpipe will be installed to drain the land and the Beaver Dam Brook. This is expected to reduce the water table of the locus . . . which is somewhat lower than the surrounding area and . . . [is] wet during certain portions of the year. There was evidence that the railroad had incurred net income deficits in 1961 and 1962 and for the six-month period ending June 30, 1963, the railroad operated at a deficit of $3,474,415. The passenger service deficit exceeded $15 million in each of the years 1961 and 1962. The railroad proposes to spend approximately $94,000 for the [proposed] work . . . . [T]he railroad [believes] that approximately $1.2 million annually of additional revenue can be obtained from the Chrysler Corporation. However, there is no positive evidence that the railroad will profit from this additional business. There was testimony offered by the railroad that the highest and best use of the locus was for industrial purposes and that it could not be developed for single or two-family homes." We regard the foregoing as only a statement of evidence and not as containing findings by the majority concerning the truth of the evidence.

[3] The minority stated that the exemption "will enable the railroad to afford to the public additional transportation services not now within its power . . . . The expectation of additional . . . shipments from one customer has induced the railroad to make the investment here contemplated . . . . This . . . freight is attracted to the railroad because of its more economic method of shipment compared with highway transportation. The resulting savings in [automobile] transportation costs . . . will benefit the buying public. . . . Moreover, we should not ignore the serious and deteriorating financial condition of the railroad. The public has a vital interest in the financial health and ability of the railroad to continue to provide rail service. . . . [This] ability . . . is imperiled by . . . [its] financial plight. . . . The granting of the railroad's request would enable it to increase its revenues by $1,147,000 annually. This additional business can be obtained by the investment of only $94,000 . . . and will be carried at regulated rates which are required to be compensatory . . . . [T]he proposed use will not adversely affect the neighborhood of the locus . . . [and] would reclaim a swampy area . . . . The additional traffic generated would not be significant in terms of the existing traffic on Hollis Street. This locus . . . is not appropriate for [residential] development . . . because of its irregular shape, poor soil conditions and its . . . proximity to industrially zoned land and the railroad property. . . . [W]e believe that the . . . denial [of the exemption] will seriously impair the railroad's ability to serve the public."

1.   This court has had slight occasion to discuss c. 40A, § 10 (see fn. 1), except in limited respects in *Wenham* v. *Department of Pub. Util.* 333 Mass. 15, 17.   There the department had granted to a gas company exemption from a town zoning by-law for a gatehouse.   This was to contain apparatus reducing the pressure of gas to be taken from a high pressure pipe line for local distribution.   This court said that in "determining whether a present or proposed situation is 'reasonably necessary for the convenience or welfare of the public' it is immaterial whether the location has been acquired by eminent domain or by purchase," and also "that c. 40A, § 10, does not require that the proposed situation be, in the opinion of the department, the best possible one but requires only that it be 'reasonably necessary for the convenience or welfare of the public.'"   This court also said "that the availability of other sites and the efforts made to secure them, in so far as . . . pertinent at all, are merely matters of fact bearing upon the main question."   It was not necessary in the *Wenham* case to state the considerations which should guide the department in determining what is "reasonably necessary for the convenience or welfare of the public."   Accordingly we must turn for guidance to cases interpreting comparable statutes.

*Newton* v. *Department of Pub. Util.* 339 Mass. 535, 546, dealt with the extent of the obligation of this same railroad to continue to provide service because of the "interests of public convenience."   We there discussed the "standard of public convenience and necessity," which is closely similar to the standard for the department's action laid down in c. 40A, § 10.   Although there the department was called upon to take into account transportation considerations only, we held that the department in passing upon a curtailment of service in the light of "public convenience and necessity" was "entitled to consider any relevant aspects" (p. 547) of the transportation problem and to "weigh all the factors."   It properly "could give attention to general transportation conditions on these and other Massachusetts railroads" (pp. 547–548).   It was also ruled (p. 548) that "the department in determining public convenience is to

act without giving controlling weight to 'purely local considerations,' which, of course, must be considered." We think that an even wider inquiry by the department is called for in respect of an application for exemption under c. 40A, § 10, because zoning as well as transportation problems are to be considered.

The power to exempt public utilities from local zoning by-laws was given by c. 40A, § 10 (and by the statutory predecessors of § 10), to a State department, not to a local board. This fact indicates that the Legislature intended a broad and balanced consideration of all aspects of the general public interest and welfare and not merely examination of the local and individual interests which might be affected. The department's powers are not restricted by any such language as that which limits the authority of a local board of appeals to grant a variance under c. 40A, § 15, cl. 3, as amended through St. 1958, c. 381. We hold that in considering an application by a railroad for an exemption under § 10, the department is empowered and required, not only to consider the effect of a new facility upon the local community and upon persons living near by, but also to weigh the public effects of the requested exemption in the State as a whole and upon the territory served by the applicant. In the present case the scope of proper inquiry includes (in respect of transportation considerations) a determination whether the proposed facility will provide useful and economical service and benefits to shippers, consumers, industries, and others and whether and to what extent it will enhance the ability of the railroad, financially and otherwise, to perform its various public functions.

2. The decision of the issue of public "convenience" is for the department. The scope of court review is only that stated in G. L. c. 25, § 5 (as amended through St. 1956, c. 190), and in c. 30A, especially § 14. Our principal concern, where constitutional and procedural questions are not presented, is under c. 30A, § 14 (8), viz. to determine whether the department's decision is "(c) [b]ased upon an error of law; or . . . (e) [u]nsupported by substantial evi-

dence; or . . . (g) [a]rbitrary or capricious.'' To make possible our determination of these issues of law, the department is required to comply with c. 30A, § 11 (8). That section provides that the department's ''decision shall be in writing'' and ''be accompanied by a statement of reasons for the decision, including determination of each issue of fact or law necessary to the decision.'' See *Salisbury Water Supply Co.* v. *Department of Pub. Util.* 344 Mass. 716, 718; *Hamilton* v. *Department of Pub. Util.* 346 Mass. 130, 137. See also *Wannacomet Water Co.* v. *Department of Pub. Util.* 346 Mass. 453, 470. Cf. *Holyoke St. Ry.* v. *Department of Pub. Util., ante,* 440, 449–450.

In the present case the findings of fact in the majority decision are inadequate although the evidence was sufficient to enable the department to make definite findings upon most of the relevant issues.[4] The department's subsidiary findings should have dealt with each relevant issue. As it is, we have no way of knowing what facts the department found to exist and whether, in reaching its general conclusion, the department applied correct principles of law to the facts found by it. The case must be returned to the department for more complete subsidiary findings. We intend no intimation concerning what those findings should be.

3. Examination of the testimony before the department indicates to us that neither the railroad nor the town (per-

---

[4] These issues include (a) the extent of the usefulness of the proposed facility to shippers, manufacturers, motor vehicle distributors, and consumers; (b) the suitability of the locus for the proposed facility and for other uses, the physical character of the locus, the uses existing in the neighborhood, the proximity of the locus to the railroad and to a motor assembly plant (see annexed plan), and the other uses (which include residences, public and recreational buildings, welfare institutions, passenger stations, reservoirs, airports, radio and television towers, cemeteries, and some raising of live stock) permitted in this general residence district by part II, §§ A and B, of the Framingham zoning by-law; (c) the probable effect of the facility upon the gross and net revenues of the railroad; upon the railroad's ability to continue to perform its intrastate and interstate public functions; upon local and State tax revenues, local employment, and the orderly development of Framingham, and upon abutting owners; (d) the effect of the facility upon highway congestion not only in Framingham but in reducing use of highways throughout the State for long distance shipments of motor vehicles from factory to consumer; (e) the possibility that injury to abutting owners can be minimized by proper screening of the facility by trees and otherwise; and (f) the relative advantages and disadvantages of the proposal from the standpoint of the public welfare and convenience.

haps because c. 40A, § 10, had not previously been construed by this court in respects here relevant) presented evidence on as broad a basis as would have been appropriate, concerning the many relevant general aspects of the public interest. Also, over seven months have now elapsed since the department's decision. Accordingly, it may be desirable for the department to reopen the case for the taking of further testimony.

4. A final decree is to be entered vacating the department's decision and order and remanding the case to the department for further proceedings consistent with this opinion.

*So ordered.*