Mezitt *v.* Department of Public Utilities.

EDMUND V. MEZITT & others *vs.* DEPARTMENT OF
PUBLIC UTILITIES.

Suffolk.   October 9, 1968. — November 7, 1968.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, KIRK, & REARDON, JJ.

*Public Utilities. Zoning,* Public utilities. *Natural Gas Pipeline Company.*

Upon an appeal under G. L. c. 25, § 5, by the owners of a nursery adjacent
to land of a natural gas pipeline company, from a decision by the
Department of Public Utilities granting, as "reasonably necessary
for the convenience and welfare of the public," a petition by the com-
pany under c. 40A, § 10, for exemption from the operation of the
town's zoning by-law of company land, on which stood already ex-
empted buildings and on which it proposed to construct a plant for
liquefying natural gas and storing it in below ground reservoirs, the
record showed no error in the decision, which was reached by the
department after weighing the effect of the new plant on other property,
the neighborhood and the town, and with careful regard for safety in
the planning and design of the project, and subjected the exemption
to certain restrictions and conditions.   [694–695]

Where it appeared that the Department of Public Utilities had before it
at a hearing under G. L. c. 40A, § 10, the complete layout for only
two of seven proposed reservoirs for storing gas on land in a town
sought to be exempted from its zoning by-law and "only that portion
of the process equipment which is required for the initial construc-
tion," and in granting the desired exemption had imposed a restriction
that no reservoirs in addition to such two should be constructed with-
out its approval, such restriction was ordered modified to provide that
such approval and approval of concomitant equipment should be
after notice and hearing before the department.   [697]

PETITION filed in the Supreme Judicial Court for the
county of Suffolk on January 14, 1966.

The case was reserved and reported by *Whittemore,* J.,
without decision.

*Morris Shapiro* for the petitioners.

*Norman J. Richards* (*Carl B. Israel* with him) for Tennessee
Gas Transmission Company.

*Peter Roth,* Special Assistant Attorney General, for the
Department of Public Utilities.

*Edward N. Gadsby* for Central Massachusetts Gas Com-
pany & others, amici curiae.

WHITTEMORE, J. The petitioners, Weston Nurseries, Inc. and three individuals, being the owners of the land in Hopkinton on which the nursery business is conducted, appeal under G. L. c. 25, § 5, as amended, from a decision of the Department granting an exemption pursuant to G. L. c. 40A, § 10, from the Hopkinton zoning by-law for a parcel of land adjacent to the nursery land, owned by the Tennessee Gas Transmission Company (Tennessee Gas).

The Department's decision, dated December 8, 1965, determined that the construction by Tennessee Gas of a plant for liquefying natural gas and storing it in below ground level reservoirs was "reasonably necessary for the convenience and welfare of the public" and granted the exemption subject to certain restrictions and conditions. The intention is to use the stored gas to supplement normal pipeline supply particularly during periods of peak winter demand.

Tennessee Gas is a natural gas pipeline company as defined by G. L. c. 164 and a public service corporation supplying natural gas in bulk to a number of Massachusetts gas companies. Eighteen of those gas companies have been permitted to intervene and have urged affirmance of the Department's decision.

The Federal Power Commission, on July 26, 1965, determined that public convenience and necessity required the proposed "construction and operation of [the] facilities" and ordered that a certificate therefor issue. According to the findings and order (an exhibit before the Department) the proposal was for "a liquified natural gas (LNG) plant, a cryogenic in-ground (LNG) storage facility and regasification . . . facilities . . . [by means of which] natural gas . . . during off-peak periods [will be] liquified at a rate of 12,500 Mcf per day, and stored at a temperature of –260° Farenheit in two in-ground frozen bedrock containers."

The petition of Tennessee Gas to the Department recited the Commission order and its proposal "to erect a plant to liquefy, store and re-deliver natural gas, including a compressor building, a processing complex and underground

reservoirs." In describing the proposed plant it recited, inter alia, "[t]he reservoirs (seven in number) and accessory facilities, all are located approximately 250 ft. or more, from any existing property line." The decision of the Department recites: "Initially, two cylindrical reservoirs will be constructed which will be identical and which will be one hundred thirty five feet in diameter and one hundred eighty feet in depth. Provision has been made for the installation of five additional reservoirs on the same site as load conditions require."

The Department's order exempted the site of ninety-eight acres, more or less, from the operation of the zoning by-law "in accordance with the testimony given at the hearing," subject to restrictions as to blasting and sound control during construction and to ten permanent rules, including Rule I: "This order shall apply to additional reservoirs."

1. Except as stated in section 2 of this opinion we discern no error in the decision or the proceedings. The decision shows that the Department weighed the effect of the new plant on the neighborhood and on the town. Several town officials asked questions and stated their reservations as to the desirability and effect of the plant but there was no formal opposition except by the petitioners. The Commissioner of Natural Resources appeared, asked a few questions, and did not oppose. The decision noted that the chairman of the board of selectmen appeared for his board in favor of the petition.

The findings and the decision showed sufficient concern for the impact on the local area. The plant, as the decision recites, is to be located on the northeast corner of the town approximately 3,000 feet from the Ashland-Hopkinton boundary. The site is surrounded on three sides by the nursery land; the nearest dwelling is 2,300 feet from the proposed location of the storage tanks; and the nearest building used for human occupancy, the Weston Nurseries office and storage building, is approximately 1,800 feet away. The Permanent Rules restrict the emission of con-

taminants, fix sound levels and ground temperature, and prescribe fire and leakage protection and landscaping. The evidence showed careful regard for safety in the planning and design of the project.

With any rezoning that increases the business use of what had been a residential area, some adverse effect on the value of adjacent or nearby land is a possible and, in many cases, a likely concomitant. This is a consideration for the rezoning authority. In this case the Department is given the rezoning power because the public "convenience or welfare" (G. L. c. 40A, § 10) to be considered is that of the entire area of the Commonwealth served by the regulated utilities using the gas to be stored. *New York Cent. R.R.* v. *Department of Pub. Util.* 347 Mass. 586, 592. The need and the advantages of the plant were shown in the uncontroverted evidence, and the Department was fully justified in finding that "the proposed situation of the parcel . . . and the type of structures to be erected thereon are reasonably necessary for the convenience and welfare of the public." Nothing in the testimony of the petitioners required an express finding as to the effect on hypothetical future residential use of their land in the event the nursery business should be discontinued.[1]

There is no basis in the evidence for concluding that other property values in the town would be affected. The statement in the decision that the "question of alleged damages to property values is not properly before us, the Department having no jurisdiction in this respect," does not show that the Department did not weigh such evidence as there was of an

---

[1] A petitioner testified: "A question of concern to all nurserymen is land value, because we don't know of any nurserymen who ever made any money in the nursery business. They have all made it in the accelerated price of land as they have used it and finally cashed in on the land values. Our particular area in Hopkinton owned by the Mezitt families is large enough so it is very desirable as development land. We have been approached by many people to subdivide it, but the cost of developing much of this land has been higher up to now than we felt that land value for any other purpose could possibly become. Therefore, we intend to stay in the nursery business. I feel quite strongly that the Tennessee Gas installation is certainly going to lower the value of the adjacent land, but the performance of the Tennessee Gas Company itself probably will be one of the large determining factors in this feeling of mine in the value of adjacent land in the future."

adverse effect on other property. Indeed, its full discussion of the asserted effect of "frost, air pollution, soil erosion on nursery crops, fire, noise [and] contamination of water" shows the contrary. It is of course true that the Department may not make any award for concomitant damages to property, but, as the decision shows it was aware, adverse effects that may be reflected in lessened values are relevant.

It was not inappropriate for the Department to note, as bearing on the adverse effect of a further zoning exemption, the circumstance that the site had already been exempted by its decision in 1963 for a compressor station, combination warehouse, garage, shop and office in one building, a radio tower and loading dock.

There was no error in prescribing in Rule B that "[t]he ambient air at the property line shall not contain more than . . . [prescribed] quantities of contaminants."[2] The testimony was that there would be no more air pollution than would be expected from automobile engines. Before compressing and freezing the gas, all components that might cause malfunction are removed. "This would include carbon dioxide, water, hydrogen sulphide and other heavier hydrocarbons." These are combined with the fuel gas burned in the compressors. According to testimony the products of the combustion would be carbon dioxide and water. We assume, however, that the Department knew that such combustion tends to put other products in the atmosphere. There was no testimony as to dangerous pollutant levels. The petitioners referred to the observed effect of heavy pollution on plant life and it was appropriate for the Department to condition its order on the permitted pollution levels which its expertise indicated were suitable. It was not necessary in the circumstances to inform the parties that it would do so.

| [2] "Contaminants | Air Quality Criteria | Emission Limitations |
|---|---|---|
| Sulphur dioxide ($SO_2$) | 0.22 ppm | 1 gram/sec. |
| Ethylene ($CH_2CH_2$) | 0.1 ppm | 0.5 gram/sec. |
| Aldehydes (–CHO) (as formaldehydes HCHO)" | 0.22 ppm | 1.25 gram/sec. |

Several objections to the Department's findings are unfounded. One of the petitioners testified that the commercial nursery has about 350 acres under cultivation. A finding objected to was consistent with this testimony. The finding that Tennessee Gas had "contract commitments to deliver the gas stored here," refers in context to the gas to be stored in the initial two containers and the evidence plainly so shows. The evidence indicated that the compressors would not be in bedrock and hence there was no reason to fix vibration limits.

2. (a) The approval and authorization of the present order, while it rightly exempts the site from the zoning by-law for use for the purpose indicated, must provide that the construction of the additional proposed five reservoirs and accompanying equipment will require further order of the Department after notice and hearing. The project was insufficiently delineated in its larger aspect.

The eventual plan contemplates, as stated, seven in-ground tanks, equipment to remove the impurities, a compressor building housing ten gas and refrigerant compressors and pumps and heat exchangers to re-gasify the liquid natural gas. The layout plan exhibited to the Department, and in accordance with which Tennessee Gas proposes to proceed, shows, however, the complete layout for only two reservoirs and "only that portion of the process equipment which is required for the initial construction." The plan drawn in heavy black ink indicates by circles the proposed sites of only four "future reservoir[s]." The witness for Tennessee Gas, after testifying that the plan showed provision for five additional reservoirs, said, "Apparently one didn't print. There is one up in here [drawing]." The exhibit shows a light pencil line encircling an area shown as committed to a "Flare pit."

The Department found that Tennessee Gas proposed to construct a large two story aluminum building "which will house the [presently contemplated] four slow speed reciprocating gas engine driven compressors . . . and their control equipment." The testimony was that additional compressors will be placed in the same building. Perhaps,

therefore, the structural work for housing the compressors and additional equipment will be completed in the first stage.

The Department's order rightly recognizes that further authorization is required. Permanent Rule J provides: "There shall be no change in the design, size, cost or location of the proposed facilities and no additional reservoirs shall be constructed without the approval of the Department." No provision is made, however, for notice and hearing. The expectation of the Department that the site and the presently to be built installations can be adjusted to accommodate more facilities without increasing the adverse effect on the nearby land or the community is reasonably based on this record. But in some important respects the plant proposed differs from any in operation elsewhere at the time of the hearing. Before the plant is made two and one-half times as large as now is to be constructed, the abutters and the town should have an opportunity to call to the attention of the Department any observed seriously adverse effects from the operation of the initial plant, particularly those against which the decision of the Department shows an intent to provide.[3]

State authority is substantially limited in respect of a site found by a Federal agency to be reasonably necessary for an interstate facility. *New York State Natural Gas Corp.* v. *Elma*, 182 F. Supp. 1, 6 (W. D. N. Y.). But there appears little reason to go beyond the Federal order until it is known what extension thereof will be made.

(b) The Department expressly found that sound levels recommended by an expert engaged by the town and Weston

---

[3] The Permanent Rules provide: "D. Ground temperatures to a depth of twenty-five feet shall be so controlled that the ground temperature at the property line shall be not less than the normal ambient temperature for the area." On the evidence this should protect the nursery land from in-ground frost or freezing emanating from the liquid gas and the reservoir walls which will be the glacial aggregate and granite rock in which the reservoirs are dug, sealed by freezing for a considerable distance around the reservoirs. The reservoirs are to be covered with insulation material between "low temperature" steel roofs. There is no evidence whether the air over the tanks will be materially cooled, so as to lend substance to the abutters' fear that cold air will drain from the site to their lower adjacent land with injury to plants. Here actual experience may be a guide in respect of further or modified restrictions.

Nurseries "are reasonable at the property line." It prescribed, however, for the property line, the higher level now existing at the plant itself (about that of a "noisy office") from the more noisy single turbine compressor, which the witness for Tennessee Gas testified might also be expected at the plant from the new, quieter engines.

We agree with Tennessee Gas and the interveners that there is a basis in the evidence for the sound restrictions in terms imposed. The decision is to be modified, however, to remove the ambiguity as to what is intended as to the prescribed noise level.

(c) Permanent Rule I is to be modified to provide: "This order shall apply to additional reservoirs and concomitant equipment authorized by the Department after notice and hearing with such modification in any or all of the Permanent Rules as shall then appear reasonably to be required or advisable."

3. Modified as aforesaid, the decision is affirmed.

*So ordered.*