NEWBURY JUNIOR COLLEGE vs. TOWN OF BROOKLINE
& others.[1]

Suffolk.   October 11, 1984. — January 14, 1985.

Present: BROWN, ROSE, & KASS, JJ.

*Practice, Civil,* Relief in nature of certiorari. *License. Lodging House. Education. Zoning,* Validity, Educational institution.

In a proceeding for judicial review of the denial of a lodging house permit by a town's board of selectmen the judge did not err in purporting to act under both G. L. c. 231A and G. L. c. 185, § 1 (*k*), inasmuch as he dealt properly with the questions presented by an action in the nature of certiorari, which was the appropriate method of review. [201-202]

Discussion of the scope of the municipal power under G. L. c. 140, § 23, to license lodging houses, and its relationship to provisions of G. L. c. 40A, § 3, limiting the exercise of the zoning power with respect to land or structures used for educational purposes. [202-206]

The selectmen of a town acted unlawfully in denying a lodging house license to a junior college for the use of certain buildings as a student dormitory where it appeared that the college and its officers possessed the requisite character and ability to operate the buildings as a dormitory; that the dormitory, as proposed, complied with building laws and with the town's lodging house regulations; and that the selectmen's action had been motivated by the opposition of neighboring residents to the use of the buildings as a dormitory. [206-208]

CIVIL ACTION commenced in the Superior Court Department on January 21, 1983.

The case was heard by *William I. Randall,* J., sitting under statutory authority.

*Sara Holmes Wilson,* Assistant Town Counsel, for the defendants.

*David A. Guberman* for the interveners.

---

[1] Board of Selectmen of Brookline. The Fisher Hill Association, Inc., a neighborhood association, and individual abutters were permitted to intervene as defendants.

*Loyd M. Starrett* for the plaintiff.

KASS, J. From 1966 to 1972, Cardinal Cushing College (Cushing) used the buildings involved in this controversy as dormitories.[2] Newbury Junior College (Newbury), a new owner of a portion of the former Cushing campus, applied on October 28, 1982, to the selectmen of Brookline for a lodging house license under G. L. c. 140, § 23, as appearing in St. 1981, c. 351, § 73, so that it might use the buildings as dormitories to accommodate 167 students, two fewer than the town had allowed to Cushing. The selectmen, claiming untrammeled discretion to grant or deny such an application, denied it.

Upon a complaint in the nature of certiorari and, alternatively, for declaratory relief, the judge of the Land Court, sitting by statutory designation in the Superior Court, determined that the denial of the licenses applied for was arbitrary and capricious and ordered issuance of the licenses. He did so on two grounds, both of which the selectmen attack on appeal: *first,* that a town is to grant lodging house licenses on the basis of the physical suitability of the buildings concerned and the moral character of the licensee, not on the basis of whether dormitory occupancy strikes the town as wise land use; *second,* that a town may not, through exercise of the licensing power, achieve by the back door a land use limitation which G. L. c. 40A, § 3, as appearing in St. 1975, c. 808, § 3, expressly forbids as a zoning option. That statutory provision, known as the Dover Amendment, provides that no zoning by-law may "prohibit, regulate or restrict the use of land or structures for . . . educational purposes on land owned . . . by a nonprofit educational corporation."[3]

[2] 129 and 135 Fisher Avenue. Cushing had begun using buildings at 117 and 135 Fisher Avenue in 1955. The accommodation at 129 Fisher Avenue was built following a failed attempt by the town to prevent dormitory use through zoning restrictions. That episode is memorialized in *Sisters of the Holy Cross* v. *Brookline,* 347 Mass. 486 (1964).

[3] The sobriquet Dover Amendment has its origins in a zoning by-law provision adopted by Dover in 1946, which purported to exclude sectarian educational use in the residence districts of that town. That by-law was nullified by St. 1950, c. 325, § 1, an amendment to The Zoning Enabling Act which proscribed such an exclusion. See *Attorney Gen.* v. *Dover,*

The very locus involved in this case has previously been the target of two attempts to turn the flank of the Dover Amendment. Both were repulsed. In *Sisters of the Holy Cross* v. *Brookline,* 347 Mass. 486 (1964), Brookline had adopted a zoning by-law which, so far as the locus was concerned, imposed on the construction of educational facilities the dimensional limitations required of single-family dwellings. The court, in determining that the town could not so restrict the use of land by an educational institution, thought it "unlikely that the Legislature would exempt religious and educational institutions from local regulations of use and at the same time permit this exemption to be virtually nullified by a requirement that such institutions construct their buildings on dimensions applicable to single family houses." *Id.* at 494.[4]

Subsequently the town again revised its by-law in a fashion which, in effect, allowed it to restrict schools in the use of their real estate, largely through the mechanism of a master development plan approval procedure. See Brookline Zoning By-Law § 4.30, use item 10(b) (February 3, 1982). That procedure, upon review by the Land Court, was also held subversive of the Dover Amendment. See *Newbury Junior College* v. *Brookline,* 15 Mass. App. Ct. 1109 (1983), which (under Appeals Court Rule 1:28, as amended, 10 Mass. App. Ct. 942 [1980]) affirmed on the grounds stated in the decision of the Land Court judge.[5]  See also *The Bible Speaks* v. *Board*

---

327 Mass. 601, 603 (1951). As it now appears in G. L. c. 40A, § 3, the Dover Amendment permits municipalities to subject religious and educational institutions to "reasonable regulations concerning the bulk and height of structures and determining yard sizes, lot areas, setbacks, open space, parking and building coverage requirements."

[4] See, however, the later case of *Radcliffe College* v. *Cambridge,* 350 Mass. 613, 618 (1966), allowing a municipality through the exercise of its zoning power, to require that a college provide parking in connection with a new library building. That gloss on the Dover Amendment was worked into The Zoning Enabling Act (c. 40A) in the course of the recodification effected by St. 1975, c. 808, § 3. See note 3, *supra.*

[5] The Land Court case bears case no. 105589 and the case title, *Sisters of the Holy Cross* v. *Brookline.*

*of Appeals of Lenox,* 8 Mass. App. Ct. 19 (1979); *Commissioner of Code Inspection of Worcester* v. *Worcester Dynamy, Inc.,* 11 Mass. App. Ct. 97 (1980).

Since 1965, dormitories of educational institutions have been subject to the laws regulating lodging houses. See St. 1965, c. 171, about which we shall have more to say in this opinion. Accordingly, Newbury's next step was to apply for a lodging house license. Its first application was for a license to accommodate 200 students, a number consistent with the number of students that had resided at Cushing, but greater than the number – 169 – that had occupied the dormitory buildings concerned, 129 and 135 Fisher Avenue. Neighborhood opposition was intense, and the selectmen denied the application without explanation, other than to say that the board's vote "reflected a judgment that the lodging house license for 200 lodgers at 117, 129 and 135 Fisher Avenue would adversely impact the neighborhood." The chairman of the board held out the hope that resumption of dialogue between Newbury and the neighborhood might "work out something that would be mutually satisfactory." The trial judge found that a main reason for denial was the increase in students from 169 to 200.

Thus rejected and advised, Newbury filed new applications, one for 127 students in 129 Fisher Avenue, and another for 40 students in 135 Fisher Avenue, a total of 167. There was a new hearing at which there was again vociferous neighborhood opposition. Again, the selectmen denied the applications. One selectman offered as a reason that use of Newbury's dormitory buildings as dormitories would exacerbate parking problems in the Fisher Hill area.[6] The chairman expressed his opinion that a lodging facility for students would have a negative impact on the area. Fundamentally, it was the view of the board, as stated by its chairman, "that the [b]oard has total discretion in this matter and can make their judgment based

---

[6] On the basis of the record, this was a puzzling conclusion. Newbury had adopted regulations which forbade resident students to have cars on the premises. If the property were confined to nonresident use, it seems inevitable that there would be more coming and going by car and more use of parking space.

upon the merits and the beliefs of what the [b]oard has heard, and our judgment."

At that juncture, Newbury had obtained occupancy permits from the building commissioner of Brookline, which attested to Newbury's right, under building and zoning law, to use the two buildings as dormitories for 170 students. Presumptively, at least, the dormitory use sought complied with the parking requirements in art. 6 of the zoning by-law, requirements which, if reasonable, the town could enforce. See notes 3 & 4, *supra*. The building commissioner further notified the selectmen in writing that the buildings complied with the State Sanitary Code and Brookline's Lodging House Rules and Regulations. Reports from fire, police, and health officials were equally positive. The trial judge took a view of the property and found that it "would be difficult to find better appointed and cleaner dormitories in Boston or elsewhere. The court finds that the same are fit for habitation by at least 167 students."

1. *Procedural matters.* The appellants essay a procedural attack on the trial judge's decision on the ground that he purported to act under G. L. c. 231A and G. L. c. 185, § 1(*k*). The appropriate review of licensing proceedings is in the nature of certiorari. *Johnson Prod., Inc.* v. *City Council of Medford,* 353 Mass. 540, 545 (1968). "[D]eclaratory relief under G. L. c. 231A, § 1, is not a substitute remedy for an action in the nature of a writ of certiorari to review the merits of a discretionary decision made by licensing authorities." *Konstantopoulos* v. *Whateley,* 384 Mass. 123, 129 (1981). See *Caswell* v. *Licensing Commn. for Brockton,* 387 Mass. 864, 877 (1983). Compare, however, *Reading* v. *Attorney Gen.,* 362 Mass. 266, 271 (1972), which encourages seeking a plurality of remedies, including declaratory relief. The point need not detain us. Newbury's complaint sought relief in the nature of certiorari, and the judge's decision comes to grips with the questions which are posed by review in the nature of certiorari: Were the proceedings before the town body in accordance with law? *Reading* v. *Attorney Gen.,* 362 Mass. at 269. Did the town body apply relevant criteria to its decision? *Foster from Gloucester, Inc.* v. *City Council of Gloucester,* 10 Mass. App.

Ct. 284, 295 (1980). Did it act arbitrarily, unreasonably or capriciously?[7] *McSweeney* v. *Town Manager of Lexington,* 379 Mass. 794, 800 (1980). *Foster from Gloucester, Inc.* v. *City Council of Gloucester, supra* at 295.

The appellants make a further argument that the judge erroneously relied upon evidence outside of the town's return of the record of the municipal proceedings. They do not identify what that evidence was, but, in any event, the assertion is an academic one because the record furnishes all the factual premises necessary for decision. Parenthetically, we do not regard the judge's viewing the premises as going beyond the return. The selectmen, in their minutes, stated that they had viewed the dormitory buildings, and it was appropriate for the judge to see what the selectmen had seen.

2. *Criteria for granting lodging house licenses.* The breadth of discretion which local authorities enjoy in granting or denying licenses varies. In the case of common victualler licenses and licenses to dispense liquor, for example, town and city boards may exercise judgment about public convenience and public good that is very broad indeed. *Liggett Drug Co.* v. *License Commrs. of N. Adams,* 296 Mass. 41, 50-53 (1936). *Great Atlantic & Pacific Tea Co.* v. *License Commrs. of Springfield,* 387 Mass. 833, 839 (1983). *Pronghorn, Inc.* v. *Licensing Bd. of Peabody,* 13 Mass. App. Ct. 70, 73 (1982). At that, the discretion is not untrammeled; an aggrieved appli-

---

[7] We need not decide whether the licensing procedure involved in this case should be reviewed under the somewhat broader "substantial evidence" test, rather than the "arbitrary and capricious" test. Which test is to be applied when a court reviews under certiorari principles shall be adjusted to the substance of the complaint. *Boston Edison Co.* v. *Boston Redevelopment Authy.,* 374 Mass. 37, 49 (1977). *McSweeney* v. *Town Manager of Lexington,* 379 Mass. 794, 799 (1980). *Saxon Coffee Shop, Inc.* v. *Boston Licensing Bd.,* 380 Mass. 919, 922-925 (1980). A persuasive argument may be made that a licensing proceeding involving a right that is the subject of special legislative protection, viz., carrying on an educational use, should have the benefit of the somewhat more demanding "substantial evidence" standard of review. Cf. *Caswell* v. *Licensing Commn. for Brockton,* 387 Mass. 864, 878 n.9 (1983). As we analyze the case before us, it is possible to dispose of it, as did the trial judge, under the "arbitrary and capricious" standard.

cant who has been denied a common victualler's license can prevail upon a showing that the licensing authority has proceeded upon erroneous ground or has otherwise violated the rights of the applicant. *McDonald's Corp.* v. *Selectmen of Randolph,* 9 Mass. App. Ct. 830, 832 (1980). Licenses to keep for hire a billiard, pool, or sippio table or a bowling alley are the subject of broad local discretion, no doubt because in a more innocent age those diversions were associated with the road to depravity, if not already dissolute in themselves. See *Marchesi* v. *Selectmen of Winchester,* 312 Mass. 28 (1942). Licensure of electricians and plumbers, by comparison, depends upon compliance with objective and ascertainable criteria, and successful passing of examinations. See G. L. c. 141 and c. 142. This diversity in licensing standards has been long recognized. See Note, The Delegation of Discretion in Massachusetts Licensing Statutes, 43 Harv.L.Rev. 302, 306 (1929).

Nothing in the text of G. L. c. 140, § 23, offers guidance as to where on the spectrum of discretion the licensure of lodging houses is located. In the circumstances it is appropriate to look to legislative history for instruction. *Liggett Drug Co.* v. *License Commrs. of N. Adams,* 296 Mass. at 49-51. See also *Newbury St. Associates* v. *Assessors of Boston,* 386 Mass. 513, 515 (1982). The impetus for St. 1918, c. 259, by which the lodging house provisions which now appear as G. L. c. 140, §§ 22-32, were originally enacted,[8] appears to have been concern about health and morality. When the Senate Committee on Public Health reported out the bill which led to enactment of the legislation, it noted that the bill was a partial response to a letter from the State Department of Health urging, as part of the war effort,[9] a campaign against venereal disease. That objective is conspicuous in the statutory text which imposes criminal penalties should a licensee: use a lodging house for immoral solicitation, immoral bargaining, or immoral conduct

---

[8] Section 22A, relating to cooking facilities in lodging houses, was inserted by St. 1970, c. 859, § 1.

[9] World War I.

(G. L. c. 140, § 26); or knowingly permit occupation of a room of less than 400 square feet by a woman on different occasions within a period of thirty days with different men (*ibid.*). Sections 27, 28, and 29 have to do with keeping of registers of the true names of occupants. That the prevention of immoral conduct was a major purpose of lodging house licensing was recognized in *Maher* v. *Brookline,* 339 Mass. 209, 215 (1959), although the court saw the reach of the lodging house laws as extending to nursing homes, where immoral conduct of the conventional sort was less likely.[10]

As originally enacted, the definition of lodging house which appears in G. L. c. 140, § 22, excluded "dormitories of charitable, educational or philanthropic institutions." Statute 1918, c. 259, § 1. In 1965, two petitions were filed in the Legislature to place off-campus dormitories within the coverage of lodging house licensing. A third petition filed at the behest of the health commissioner of Boston, which ultimately won legislative favor, covered all dormitories and fraternity houses of educational institutions. The mid-1960's was a period of student radicalism, and it is not unreasonable to infer, given the historic purpose of the lodging house laws, that the legislative concern dwelt on what was going on inside college dormitories and who was supervising them. There is, thus, some support for the ruling of the trial judge that the purpose of the lodging house laws is to assure that the facilities defined in G. L. c. 140, § 22, will be orderly, law abiding operations, responsibly managed by appropriate persons, and that the facilities are safe, sanitary, and suitable for human habitation. Further confirmation for this view of the scope of the statute appears in G. L. c. 140, § 30, which authorizes revocation of a lodging house license if the licensing authorities "are satisfied that the licensee is unfit to hold the license" and authorizes suspension "for any cause deemed satisfactory to them." Compare the "revocation at pleasure" provision considered in *Saxon Coffee Shop, Inc.* v. *Boston Licensing Bd.,* 380 Mass. 919, 927 (1980).

---

[10] Legislative repairs followed at once. By St. 1960, c. 740, convalescent and nursing homes were expressly excluded from the definition of lodging house in G. L. c. 140, § 22.

We do not think persuasive the argument made by the town that if lodging house licensure is limited to considerations of the physical adequacy of facilities and whether they are responsibly run, the power duplicates that which authorities may exercise under building laws and those enabling them to abate a nuisance. Cf. *Gillam* v. *Board of Health of Saugus,* 327 Mass. 621, 623 (1951). Licensing serves a triggering function, to alert local authorities that they should monitor conditions on the licensed premises. Compare *Mosey Cafe, Inc.* v. *Licensing Bd. for Boston,* 338 Mass. 199, 205 (1958).

If the criteria for licensing lodging houses are not more limited and specific than a general view of community interest (the standard the selectmen appear to have applied), the licensure statutes run on a collision course with the Dover Amendment. Cases under the Dover Amendment have established that municipalities may not, by regulatory pretext under G. L. c. 40A,[11] nullify the special protection accorded to religious or educational purposes. *Sisters of the Holy Cross* v. *Brookline,* 347 Mass. at 494. *Radcliffe College* v. *Cambridge,* 350 Mass. 613, 618 (1966). *The Bible Speaks* v. *Board of Appeals of Lenox,* 8 Mass. App. Ct. at 33. *Commissioner of Code Inspection of Worcester* v. *Worcester Dynamy, Inc.,* 11 Mass. App. Ct. at 99-100. See *Worcester* v. *New England Inst. & New England Sch. of Accounting, Inc.,* 335 Mass. 486, 491-495 (1957). Foreclosing local exercise of preferences as to what kind of educational or religious uses will be welcome was the precise objective of the Legislature in passing the Dover Amendment. *The Bible Speaks, supra* at 33. In a similar spirit we recently held invalid a zoning by-law which, through the device of the special permit, enabled a planning board to pass with a wide range of discretion on uses allowed as matter of right in all business districts. *SCIT, Inc.* v. *Planning Bd. of Braintree, ante* 101 (1984). The central considerations in these cases are the difference between reasonable regulation of use and prohibition of use, *Y.D. Dugout, Inc.* v. *Board of Appeals*

---

[11] For example, unreasonable dimensional requirements, bulk restrictions or parking requirements.

*of Canton,* 357 Mass. 25, 31 (1970), and the principle that land in similar circumstances should be treated alike. *SCIT, Inc., supra* at 107.

All the cases in the preceding paragraph deal with application of the zoning power. The town and the interveners are quick to urge that licensing is parallel regulatory machinery, which, like municipal regulation of wetlands under G. L. c. 131, § 40, may operate independently of zoning. See *Lovequist* v. *Conservation Commn. of Dennis,* 379 Mass. 7, 14-15 (1979). The proposition is not entirely without support. In *Marchesi* v. *Selectmen of Winchester,* 312 Mass. at 31, the court, confronted with an application for a bowling alley license, remarked that the "general aim both of the zoning by-law and of the licensing statute is the promotion of the public welfare, but each is independent of the other and seeks to accomplish its purpose by different means." Bowling, an amusement, is, however, an activity of the sort as to which, traditionally, local authorities have had the broadest discretion. There underlies the grant of that discretion the idea that places of amusement may "degenerate and become obnoxious to the public welfare." *Jaffarian* v. *Building Commr. of Somerville,* 275 Mass. 267, 271 (1931). *Turnpike Amusement Park, Inc.* v. *Licensing Commn. of Cambridge,* 343 Mass. 435, 437 (1962). Another such example is *E.A.D. Realty Corp.* v. *Selectmen of Shrewsbury,* 6 Mass. App. Ct. 826 (1978), in which a decision of the board of appeals of that town to grant variances and a special permit did not bind the selectmen when exercising their power to license, under G. L. c. 148, § 13, the storage of explosive or inflammable substances.

To some extent those cases involve parallel but distinct public issues: drainage and water supply questions in the case of wetlands, police questions in the case of public amusements, and safety questions in the case of inflammables. In none of the cases does the licensing process work, as here, at cross purposes with an activity protected by the Legislature. We are of opinion that a municipality may not, through the exercise of its power under G. L. c. 140, § 23, undo the Dover Amendment by forbidding the use of land for educational purposes on

general grounds of adverse impact on the neighborhood or similar land use consideration. A dormitory license may be denied because the facilities are physically inadequate, because the applicant institution has a bad record in running dormitories, or because supervisors are unqualified, or of bad character. A dormitory license may not be denied merely because the licensing body thinks that the educational use would not be good for the neighborhood. A municipality "cannot achieve indirectly that which it is forbidden to achieve directly." *Rogers* v. *Provincetown,* 384 Mass. 179, 182 (1981). The trial judge expressed the idea in a similar vein: "The courts have repeatedly said that educational use cannot be prohibited by zoning. To allow such use to be prohibited by any backdoor method . . . is . . . wrong." See also *Cape Ann Land Dev. Corp.* v. *Gloucester,* 371 Mass. 19, 24 (1976) (city council is forbidden to deny a special permit for the reason that the locus will be used for shopping center purposes when shopping center use was protected by G. L. c. 40A, § 7A, as appearing in St. 1965, c. 65). As in *Doliner* v. *Planning Bd. of Millis,* 343 Mass. 1, 5 (1961), our task is one of statutory reconciliation. Here, that work is to reconcile the licensing power conferred by G. L. c. 140, § 23, with the Dover Amendment, "so that they will accomplish harmoniously the legislative purpose so far as that can be ascertained." *Ibid.*

With limitations on the selectmen's power to deny a license thus established, we harbor no doubt that the selectmen acted unlawfully in this case. There is a substantial history of use of the buildings in question as dormitories, and while so used they have given no occasion for distress to the community that appears on the record. The proposed number of inhabitants is the same as that lawfully occupying the buildings in the past. Newbury is an accredited degree granting institution. No unfavorable evidence about its capacity to operate the dormitories or about the character of its officers appears in the record. What does appear on those subjects is favorable. The judge found the persons who operate Newbury to be "of excellent character and ability, well qualified to operate a college." The dormitory building complied with building law and Brook-

line's own lodging house regulations. It requires no reading between the lines of the record of the proceedings before the selectmen to discern that the selectmen were obliged to confront pervasive neighborhood hostility to the operation of a college campus by Newbury on the locus. In that respect the neighborhood acted consistently with a twenty-year posture of opposition to use of the locus for educational purposes.

3. *Remedy.* Customarily in cases where the judge has properly concluded on the record created at trial that the licensing body acted on unlawful grounds, and, hence, arbitrarily and capriciously, the remedy is to remand the matter to the local board for further proceedings. *McDonald's Corp.* v. *Selectmen of Randolph,* 9 Mass. App. Ct. at 832. When, as here, there is a record of consistent obstruction of lawful use (it will be recalled that Newbury has already been obliged to make one trip to an appellate level, has twice been before the selectmen, and that the history of the conflict between the neighborhood and institutions goes back over two decades), it is appropriate to invoke that portion of the last sentence of G. L. c. 249, § 4, as appearing in St. 1973, c. 1114, § 289, which empowers the court, upon review in the nature of certiorari, to make "such other judgment as justice may require." In closely analogous circumstances, the court has ordered the relief denied below. See *Lapenas* v. *Zoning Bd. of Appeals of Brockton,* 352 Mass. 530, 533-534 (1967); *Cape Ann Land Dev. Corp.* v. *City Council of Gloucester,* 374 Mass. 825, 826 (1978); *MacGibbon* v. *Board of Appeals of Duxbury,* 369 Mass. 512, 520 (1976). Cf. *Mahoney* v. *Board of Appeals of Winchester,* 344 Mass. 598, 601-602 (1962). In the *MacGibbon* case, the court observed that "in view of the thirteen years the plaintiffs' application has been pending, during which the board has denied it three times on legally untenable grounds, justice and equity would not be served by a third remand." *MacGibbon* v. *Board of Appeals of Duxbury, supra* at 520. Similar considerations correctly guided the Superior Court judge when he ordered that the lodging house licenses applied for by Newbury for 129 and 135 Fisher Hill Avenue be issued by the town.

*Judgment affirmed.*