TRUSTEES OF BOSTON UNIVERSITY *vs.* LICENSING BOARD OF
BOSTON.

Suffolk.    May 18, 1987. — July 16, 1987.

Present: ARMSTRONG, BROWN, & FINE, JJ.

*License. Administrative Law,* Judicial review. *Lodging House. Education.*
*Boston.*

In an action by a university seeking review of the Boston Licensing Board's
denial of applications for lodging house licenses for certain university
dormitories, this court held, in remanding the case to the board for
further proceedings, that the board's discretion under G. L. c. 140,
§ 23, to grant or deny such applications, was limited to considerations
of public health and morality, that is, the adequacy of the facilities, the
university's record in running dormitories, and the qualifications and
character of dormitory supervisors, and that the board's discretion did
not extend to broad considerations of general public interest or land use
such as the general effect on the neighborhood if the licenses were
issued. [480]

CIVIL ACTION commenced in the Superior Court Department
on August 28, 1986.

On transfer to the City of Boston Division of the Housing
Court Department the case was heard by *E. George Daher,* J.

*Verne W. Vance, Jr. (Richard H. Pildes & Stephen A. Wil-*
*liams* with him) for the plaintiff.

*Camille F. Sarrouf (Frank C. Corso* with him) for the de-
fendant.

FINE, J. Boston University (university), a nonprofit educa-
tional institution in Boston, applied to the Boston Licensing
Board (board) for licenses for sixty-two apartment buildings
which it planned to use as dormitories to house undergraduate
students. After a public hearing, the board granted licenses for
forty-two of the designated buildings and denied licenses for

the remaining twenty[1]. All the buildings for which licenses were denied are located in the "Audubon Circle" neighborhood, where expansion of the university had become highly controversial. The board issued a decision stating as its reasons for denying the licenses that: (1) use of the buildings as dormitories would adversely affect the neighborhood by causing an unreasonable increase in noise, traffic, and parking problems; and (2) issuance of the licenses would contravene the public interest since use of the buildings as dormitories would violate two agreements entered into by the university and the city of Boston.[2] The university brought this action in the nature of certiorari[3] challenging the board's denials of the licenses. The case was tried without jury in the Boston Housing Court. In a lengthy decision, the judge ruled that the board had erred in determining that use of the buildings for dormitory purposes violated the university's agreements with the city. Nevertheless, he upheld the board's decision to deny the licenses on "public interest" grounds because of the detrimental effect the dormitories would have on the vitality of the neighborhood. On appeal, the university contends that the board erred in determining that the issuance of the licenses would violate the

---

[1] The board's decision lists twenty-one addresses for which licenses were denied. As to one of the properties listed, 27 Aberdeen Street, the university maintains that it never applied for, and does not seek, a license. The university appeals from the denials of only twenty licenses.

[2] Entitled "cooperation agreements," both were concerned with achieving neighborhood stability. The agreement of July 15, 1980, among other things, defined campus boundaries and placed limitations on the university in acquiring property outside those boundaries. The agreement of December 1, 1984, among other things, made specific reference to the Audubon Circle neighborhood. It provided for a six-month planning process leading to the sale, within twenty-four months of the agreement, of properties of the university which would be selected according to criteria set forth in the agreement. We are not called upon in this case to decide whether the university has violated the 1984 agreement by not selling within the two-year period any of the buildings for which licenses were sought and denied. The city may take whatever steps it deems appropriate to enforce the agreements. If the use of the dormitories in the Audubon Circle neighborhood is in violation of the agreements, the issuance of licenses would not prevent the agreements from being enforced.

[3] Mandamus and declaratory and injunctive relief were also sought.

agreements and that the board exceeded its authority in considering land use matters. The university also contends that the rationale of the Housing Court judge in upholding the board's decision was wrong. The board maintains that it properly considered public interest factors in denying the licenses. The parties are at odds as to whether the action of the board should be reviewed to determine if it was supported by substantial evidence or merely if it was arbitrary and capricious. See *Caswell* v. *Licensing Commn. for Brockton,* 387 Mass. 864, 877-878 (1983); *Newbury Jr. College* v. *Brookline,* 19 Mass. App. Ct. 197, 202 n.7 (1985). However, the dispositive question, whether the board applied relevant criteria in reaching its decision, may be answered without reference to either standard of review.

The dispute concerns the breadth of discretion accorded the board under G. L. c. 140, § 23, to grant or deny applications for lodging house licenses for dormitories located in Boston. General Laws c. 140, § 23, as appearing in St. 1981, c. 351, § 73, provides: "Licensing authorities may grant licenses for lodging houses . . . ." Dormitories of educational institutions fall within the definition of "lodging houses." G. L. c. 140, § 22. The issue is whether the criteria for awarding lodging house licenses for dormitories are the same in Boston as they are elsewhere in the Commonwealth.

In *Newbury Jr. College* v. *Brookline,* 19 Mass. App. Ct. at 207, we held that "[a] dormitory license may be denied because the facilities are physically inadequate, because the applicant institution has a bad record in running dormitories, or because supervisors are unqualified, or of bad character. A dormitory license may not be denied merely because the licensing body thinks that the educational use would not be good for the neighborhood." Noting that the breadth of discretion which local authorities enjoy in acting on license applications varies depending upon the nature of the activity to be licensed and the legislative objective, we based our narrow interpretation of G. L. c. 140, § 23, in part, on our conclusion, gleaned from the legislative history and the statutory context, that, in enacting the licensing statute, the Legislature was concerned

primarily with health and morality. We also recognized, however, that, if the criteria were not so limited, "the licensure statutes run on a collision course with the Dover Amendment." *Id*. at 205. General Laws c. 40A, § 3,[4] known as the Dover Amendment, provides that no zoning by-law may "prohibit, regulate or restrict the use of land or structures for . . . educational purposes on land owned . . . by a nonprofit educational corporation." The Dover Amendment does not apply in Boston, which, for a long time, has had its own zoning regulations, and which, unlike other municipalities in the Commonwealth, may maintain reasonable control over all land use, including use for educational purposes. *Emerson College* v. *Boston,* 393 Mass. 303, 305 n.1, 306 (1984). See also *McNeely* v. *Board of Appeal of Boston,* 358 Mass. 94, 107 (1970).

In this case, unlike *Newbury,* a broader range of discretion on the part of the licensing authority would not be in direct conflict with the strictures of the Dover Amendment. Based upon that distinction, the board contends that its discretion to grant or deny a license for dormitory use in Boston extends to general considerations affecting the public interest.[5] It is true

---

[4] As amended through St. 1985, c. 637, § 2.

[5] These considerations were spelled out by the board in emergency regulations which it proposed on June 5, 1986, and adopted on July 3, 1986, after hearings. The regulations were applied retroactively to the university's applications which had been filed on March 3, 1986. The particular regulation that addresses public interest factors in the review of dormitory license applications provides:

"No new license for a dormitory and no expansion of a dormitory license will be granted or denied by the Board except after a public hearing at which evidence may be presented bearing on the fitness of the applicant, the plans of the applicant for the units, the plans of the applicant for supervision of the student occupants of the units, and the consideration of whether the proposed dormitory operation will cause an unwarranted increase in noise, pedestrian or vehicular traffic, or parking, trash or crime problems at or near the proposed location."

While the authority to set standards for licensing is implicit in the authority to license, the power to promulgate regulations must be exercised in a manner consistent with proper interpretation of the statute, here G. L. c. 140, § 23. See *Commonwealth* v. *Blackgammon's, Inc*. 382 Mass. 610, 625 (1981).

that there are numerous cases which recognize such broad discretionary powers on the part of licensing authorities in connection with other licensing statutes. See, e.g., *Newbury Jr. College* v. *Brookline,* 19 Mass. App. Ct. at 202-203, and cases cited (recognizing "very broad" discretion of a licensing board to consider public interest factors in applications for common victualler and liquor licenses); *Hood Indus., Inc.* v. *City Council of Leominster,* 23 Mass. App. Ct. 646, 650 (1987), and cases cited (recognizing similar broad discretion in considering a license application to store flammable chemicals under G. L. c. 148, § 13); *McDonald's Corp.* v. *East Longmeadow, post* 904, 905-906 (1987). Licensing authorities may possess such broad discretion even if local zoning boards have independent authority to weigh similar public interest considerations with respect to the property. *Marchesi* v. *Selectmen of Winchester,* 312 Mass. 28, 31 (1942); *Davidson* v. *Selectmen of Duxbury,* 358 Mass. 64, 67-68 (1970). Those cases are not dispositive, however, of the issue of the breadth of discretion afforded a licensing board by G. L. c. 140, § 23.

In *Newbury,* we held that the range of discretion afforded licensing authorities reviewing dormitory applications under the lodging house statute was not so broad as to include general public interest and land use considerations.[6] *Newbury Jr. College* v. *Brookline,* 19 Mass. App. Ct. at 206-207. In that case we were interpreting the language of a statute of Statewide applicability. Normally the meaning of a statute applicable throughout the State does not vary from one municipality to another. See *Young* v. *Mayor of Brockton,* 346 Mass. 123, 125 (1963); compare *McDonald* v. *Superior Court,* 299 Mass. 321, 324 (1938). The legislative history of § 23 discussed in

---

[6] The board suggests that not only is the limitation on the discretion it may exercise under *Newbury* inapplicable in Boston, where the Dover Amendment is not in effect, but also that the limitation is not applicable with respect to lodging houses other than dormitories of educational institutions. Although the general discussion of the objectives of the regulatory scheme, based on the legislative history and social context, relates to all types of lodging houses, it is not necessary in this case for us to decide the breadth of discretion possessed by licensing authorities with respect to lodging houses which are not dormitories.

the *Newbury Jr. College* case (19 Mass. App. Ct. at 203-205) supports a conclusion, independent of the Dover Amendment, that the Legislature's purpose in enacting § 23 was directed primarily towards considerations of public health and morality. This was a principal ground of the *Newbury Jr. College* decision. Accordingly, we conclude that the criteria we set forth in *Newbury* apply also in Boston. Thus, in ruling on the university's application for domitory licenses, the board could consider only the adequacy of the facilities, the university's record in running dormitories, and the qualifications and character of its dormitory supervisors. It did not have the authority to consider, as it did, the general effect of the issuance of lodging house licenses on the neighborhood. The city of Boston is not left, however, without the opportunity to exercise reasonable control over the expansion of its nonprofit educational institutions. See *Emerson College* v. *Boston,* 393 Mass. at 304 n.1, 306. An educational institution in Boston may not change any of its buildings from apartment house use to dormitory use without first obtaining a conditional use permit from the zoning authorities. Boston Zoning Code §§ 6.1, 6.3, 8.7 (1985). The university had, in fact, obtained conditional use permits for all of the dormitories for which licenses were denied.

The university, relying on *Newbury* (at 208), asks us to order the board to issue the licenses. It is true that the board found that "the [u]niversity runs its dormitory facilities very well." Unlike the situation in *Newbury,* however, there is here no "record of consistent obstruction of lawful use". *Ibid.* Thus, we follow the customary procedure, giving deference to the board to consider the license applications further in light of the criteria we have held to be applicable. We reverse the judgment of the Housing Court, and order the matter remanded to the board for further proceedings and consideration in accordance with this opinion.

*So ordered.*