INSPECTOR OF BUILDINGS OF SALEM *vs.* SALEM STATE
COLLEGE & another.[1]

No. 89-P-1086.

Essex. October 18, 1989. - November 24, 1989.

Present: KASS, DREBEN, & FINE, JJ.

*Zoning*, Public authority, Educational use, Governmental use. *Municipal Corporations*, By-laws and ordinances. *Injunction. Practice, Civil*, Injunction, Interlocutory appeal.

A city had no power under G. L. c. 40A, § 3, second par., to regulate by zoning ordinance the dimensional and parking requirements for buildings constructed by the Massachusetts State College Building Authority. [96-98] DREBEN, J., concurring.

CIVIL ACTION commenced in the Superior Court Department on July 19, 1989.

A motion for preliminary injunctive relief was heard by *Peter F. Brady*, J.

*Thomas B. Bracken* for the plaintiff.

*Peter J. Harrington* for Massachusetts State College Building Authority.

KASS, J. In *County Commissioners of Bristol v. Conservation Commn. of Dartmouth*, 380 Mass. 706, 713 (1980), the court, examining G. L. c. 40A, § 3, decided that municipal zoning regulations did not extend to land or structures on "land . . . owned or leased by the Commonwealth or by its bodies politic and devoted to an essential governmental function." The question now presented is whether there is latent in § 3 a power of cities and towns to regulate the dimensional and parking criteria for buildings constructed by the Massachusetts State College Building Authority (the "Au-

_____
[1]Massachusetts State College Building Authority.

thority"). We conclude that § 3 does not contain such a specialized municipal prerogative and that Salem State College (the "College") and the Authority may proceed with their dormitory construction project on the College's south campus.[2]

We pause to explain the mildly unorthodox procedural basis on which we have considered the appeal. Under § IX A of the Salem zoning ordinance, the inspector of buildings (the "inspector") is the zoning administrator of that city. The Authority began construction of six four-story dormitory buildings and one single-story commons building on July 14, 1989. A few days later, the inspector served a stop work order on the general contractor who was doing the work. Concerning his power so to do, there was a not wholly amiable difference of opinion. On July 19, 1989, the inspector filed an action in Superior Court requesting that all work on the College job be enjoined because it did not comply with applicable municipal zoning requirements.

After hearing, a judge of the Superior Court denied injunctive relief, stating as his reason that the city had by amendment of its zoning ordinance deleted provisions exempting the College campus from the general provisions of the ordinance, that this was "action taken specifically against the College, and was unreasonable." On a petition of the inspector to this court, treated as one seeking relief under G. L. c. 231, § 118, first par., a single justice allowed the order denying preliminary injunctive relief to stand, although the single justice put his action on the different substantive ground which we here consider. The inspector then availed himself of the right, under G. L. c. 231, § 118, second par., to appeal the denial of a preliminary injunction in the Superior Court to a full panel of the Appeals Court.

Construction, meanwhile, was proceeding apace. To reduce the risk of serious loss of public resources, should the inspector turn out to be correct on the law and should it be neces-

---

[2]The Authority plans, finances, and constructs State college facilities which are ultimately turned over to the State colleges on whose campuses the facilities are built. See generally St. 1963, c. 703.

sary to require the dismantling of improvements already built, another single justice of this court allowed a motion for an expedited appeal.

Ordinarily, on an appeal from the grant or denial of preliminary injunctive relief, the only question before us is whether there is a supportable legal basis for the action of the trial court judge. That judge's action is upheld even though there exists a possibility that, on final analysis, it might prove to have been mistaken. *Westinghouse Bdcst. Co.* v. *New England Patriots Football Club, Inc.*, 10 Mass. App. Ct. 70, 75 (1980). *Carabetta Enterprises, Inc.* v. *Schena*, 25 Mass. App. Ct. 389, 392 (1988). See also *Packaging Indus. Group, Inc.* v. *Cheney*, 380 Mass. 609, 615-616 (1980); *Edwin R. Sage Co.* v. *Foley*, 12 Mass. App. Ct. 20, 25-26 (1981). Consequently, appellate pronouncements at the preliminary injunction stage have a Delphic quality so far as what the law is. When, as here, a public construction project is under way and public funds are being invested in it at a brisk weekly clip, a judicial determination that the judge below was not cosmically wrong, although we do not say that he was right, is less than satisfactory. Because of the substantial public interest involved and because the facts as developed permit us so to do, we have decided the ultimate question: whether the Authority is bound by the provisions of the Salem zoning ordinance.

Until March 14, 1988, the Salem zoning code exempted College dormitories from the dimensional requirements which otherwise applied to the R-1 zoning district in which the College is located. The amendment, which became effective on that date, removed the exemption.[3] It had been adopted in response to public dissemination of the Author-

---

[3]Notice of the proposed change in zoning ordinance was first advertised by the Salem planning board on January 26, 1988, and the amendment, therefore, if binding on the authority, would have applied to any building permit obtained after the January 26th date. See G. L. c. 40A, § 6, first par. Although the State Board of Regents had on April 8, 1986, issued a written directive to the authority to build the dormitory units and by January 14, 1988, the authority's architects for the Salem project had completed the design development phase (preliminary plans and outline specifi-

ity's project, as revealed in submissions to the Salem conservation commission and to the Massachusetts Environmental Policy Act (MEPA) unit of the Executive Office of Environmental Affairs. The inspector's stop work order and his complaint allege violations of restrictions on height, on distances between buildings, and on a site plan review procedure which applies to any building which contains more than six dwelling units.[4]

Section 2 of the act which established the Authority, St. 1963, c. 703, provides that the "body politic and corporate" created "shall not be subject to the supervision or regulation of the department of education or of any department, commission, board, bureau or agency of the commonwealth except to the extent and in the manner provided in this act. The Authority is hereby constituted a public instrumentality and the exercise by the Authority of the powers conferred by this act shall be deemed and held *to be the performance of an essential governmental function*" (emphasis supplied).

As a general proposition, the State and State instrumentalities are immune from municipal zoning regulations, unless a statute otherwise expressly provides the contrary. *Medford* v. *Marinucci Bros. & Co.*, 344 Mass. 50, 55-57 (1962). Within G. L. c. 40A, § 3, as appearing in St. 1975, c. 808, § 3, there is language that suggests the possibility of some limit on the traditional State immunity. The second paragraph of G. L. c. 40A, § 3, speaks not to State immunity generally and, therefore, leaves that immunity squarely in place as to the general category of State uses, e.g., jails, hospitals, sewerage facilities, highway maintenance depots, court houses, and State office facilities. Section 3 does make specific mention of religious and educational purposes, unrelated to the State, which it exempts from municipal zoning control.[5]

---

cations), they were a long way off from completion of contract drawings. The Authority obtained a building permit from the State inspector of buildings on July 17, 1989.

[4] On appeal, the inspector asserts the applicability of two other provisions of the zoning ordinance.

[5] So far as pertinent, G. L. c. 40A, § 3, second par., provides that no zoning ordinance or by-law shall "regulate or restrict the use of land or

That exemption is the descendent of the Dover Amendment, the origins and development of which are discussed in *The Bible Speaks* v. *Board of Appeals of Lenox*, 8 Mass. App. Ct. 19, 27 n.10 (1979), and *Newbury Junior College* v. *Brookline*, 19 Mass. App. Ct. 197, 198-199 nn. 3 & 4 (1985). Prior to the 1975 recodification of the Zoning Act, the religious and educational use exemption had been subjected to a certain gloss through case decision that permitted limited application of dimensional and parking requirements, if reasonable and not masquerading a design to exclude the protected use. See *Sisters of the Holy Cross of Massachusetts* v. *Brookline*, 347 Mass. 486, 492-494 (1964); *Radcliffe College* v. *Cambridge*, 350 Mass. 613, 618 (1966). As recodified in 1975, the Dover Amendment permits municipalities to subject religious and educational institutions to "reasonable regulations" concerning dimensional requirements and parking. See n. 5, *supra*, and *Newbury Junior College* v. *Brookline*, 19 Mass. App. Ct. at 198-199 nn. 3 & 4.

Salem (for whom the inspector, of course, is acting) asks us to read the proviso in § 3 concerning reasonable regulations as pertaining to State instrumentalities which have an educative function. Institutions of that sort are, after all, pursuing, in the words of § 3, "educational purposes on land owned . . . by the commonwealth or . . . [one] of its . . . bodies politic." Such an interpretation, however, neglects the history we have sketched of the development of the religious and educational purposes exemption, which has at all times been concerned with other than State institutions. Indeed, it could hardly have been otherwise as there cannot be — for obvious constitutional reasons — State religious institutions. The distinction was remarked upon in *County Commissioners of Bristol* v. *Conservation Commn. of Dartmouth*, 380

structures for religious purposes or for educational purposes on land owned or leased by the commonwealth or any of its agencies, subdivisions or bodies politic or by a religious sect or denomination, or by a nonprofit educational corporation; provided, however, that such land or structures may be subject to reasonable regulations concerning the bulk and height of structures and determining yard sizes, lot area, setbacks, open space, parking and building coverage requirements."

Mass. at 713, when the court observed that "§ 3 merely permits formerly exempt" — i.e., categories previously the subject of the Dover Amendment — "land or structures devoted to religious or educational purposes to be subjected to reasonable municipal zoning dimensional, but not use, requirements."

As to property of bodies politic "devoted to an essential governmental function," § 3 "does not allow municipal zoning regulation." *Ibid.* The legislation establishing the Authority, we have already seen, took care to express that the exercise by the Authority of its powers "shall be deemed and held to be the performance of an essential governmental function." St. 1963, c. 703, § 2. Perhaps it is not necessary to belabor the problem in view of the presence of those words in the Authority's enabling act and in view of decisions as relatively recent as the *County Commissioners* case, as old as *Teasdale* v. *Newell & Snowling Constr. Co.*, 192 Mass. 440, 442-443 (1906), and as middle-aged as *Medford* v. *Marinucci Bros. & Co.*, 344 Mass. at 54-57. All those cases assert the supremacy of the State over local land use regulation in connection with State construction projects, unless the Legislature has made express provision to the contrary.

That possibility of legislative provision to the contrary prompts us to take a last look at the less than clear language of the second paragraph of G. L. c. 40A, § 3. Why does it refer to "the use of land or structures for religious purposes or for educational purposes on land owned or leased by the commonwealth. . . ."? We think it contemplates the situation when a private educational or religious facility[6] is built or operated on real estate owned by the State. Certainly the language in § 3 does not amount to the express and unmistakable suspension of the usual State supremacy which the *Teasdale*, *Marinucci*, and *County Commissioners* cases require.

---

[6]We put aside, because not before us, whether the Commonwealth is inhibited by constitutional considerations from leasing or licensing real estate for private religious use.

Neither *Boston* v. *Massachusetts Port Authy.*, 364 Mass. 639 (1974), nor *Department of Community Affairs* v. *Massachusetts State College Bldg. Authy.*, 378 Mass. 418 (1979), is to the contrary. Both deal with the application of *State* statutes to the construction projects of State instrumentalities performing essential governmental functions. The *Massachusetts Port Authy.* case held that the agency was bound to comply with the Massachusetts Environmental Policy Act, G. L. c. 30, §§ 61 & 62, a result wholly to be anticipated since the fundamental purpose of the Act was to have the State and other public authorities in Massachusetts consider the impact of public construction. In the *Massachusetts State College Bldg. Authy.* case the question was whether the Authority was bound to comply with requirements for the relocation of persons displaced from home or business by public action (G. L. c. 79A). Here again, the Legislature had acknowledged a statewide need and it would have been inconsistent with that recognition to assume exemption in favor of a large category of State instrumentalities which might cause displacement.

The obligation of State instrumentalities to adhere to the Massachusetts Environmental Policy Act assures that local land use impact receives consideration which balances State and local (purely local consideration is often dominated by the "not in my back yard" or "nimby" factor) concerns. The environmental impact evaluation required under G. L. c. 30, § 61, includes inquiry into considerations of air pollution, noise, wind, shadow, growth, traffic, and local land use plans. See 301 Code Mass. Regs. § 11.28 (1987). State supremacy, therefore, may not be exercised without thought to physical impact on the surrounding local community.

For the reasons stated, a judgment is to be entered declaring that the Authority is not required to comply with the zoning ordinance of Salem. The denial of preliminary injunctive relief is affirmed.

*So ordered.*

DREBEN, J. (concurring). I concur in the result. As pointed out in *Medford* v. *Marinucci Bros. & Co.*, 344 Mass. 50, 57 (1962), the Legislature must indicate in "unmistakable terms" its intention to "authorize a municipality to thwart the Commonwealth in carrying out the functions of government." Agreeing with the majority that the language in G. L. c. 40A, § 3, is "less than clear" and "does not amount to the express and unmistakable suspension of the usual State supremacy," I find it unnecessary to give a construction of the difficult language of the statute.