CITY OF WORCESTER vs. COLLEGE HILL PROPERTIES, LLC,
& another[1] (and four companion cases[2]).

Worcester. January 7, 2013. - May 15, 2013.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

Lodging House. Contempt. Practice, Civil, Contempt. Words, "Lodgings."

This court concluded that the lodging house act, G. L. c. 140, §§ 22-32, did
not apply in circumstances in which four unrelated adults, who were col-
lege students, occupied apartments leased from the defendant property
owners, where the apartments as occupied were not "lodgings" so as to
render the defendants' properties "lodging houses" under the act [137-146];
further, this court concluded that judgments of contempt against the defend-
ants were required to be vacated, where the judgments were civil in nature
[146].

CIVIL ACTIONS commenced in the Worcester Division of the
Housing Court Department on January 13, 2010.

The cases were heard by Timothy F. Sullivan, J., and complaints
for contempt were also heard by him.

After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.

Gary S. Brackett for the defendants.

Ann S. Refolo, Assistant City Solicitor, for the plaintiff.

Philip S. Lapatin & Nathaniel F. Hulme, for Greater Boston
Real Estate Board, amicus curiae, submitted a brief.

LENK, J. The defendants own two-family and three-family
rental properties in Worcester. They leased dwelling units in these
properties to groups of four unrelated adult college students.
Each such dwelling unit contained a living room and dining
room, kitchen, bathroom, and bedrooms. The inspectional services
department of the city of Worcester (city) determined that,

---

[1]Paul F. Giorgio.

[2]City of Worcester vs. Paul F. Giorgio & another (two cases); and City of
Worcester vs. Michele Meaney & another (two cases).

where such a dwelling unit is occupied by four or more unrelated adults, "not within the second degree of kindred" to each other, the dwelling unit is a "lodging" for purposes of G. L. c. 140, §§ 22-32 (lodging house act or act), and that each of the defendants was accordingly operating a lodging house without a license. See G. L. c. 140, § 24. This case presents the question whether such dwelling units as occupied constitute lodgings so as to render the subject properties lodging houses under the lodging house act. We conclude that the dwelling units are not lodgings and the properties are not lodging houses under the act.

1. *Background.* The essential facts are undisputed. The defendants own two-family and three-family rental properties in the city.[3] The properties contain dwelling units commonly referred to as apartments, consisting of a living room and dining room, a kitchen, a bathroom, and an unspecified number of bedrooms. Each apartment at issue here was leased to four local college students for a twelve-month period. The students, all adults, were not related to each other or to the defendant lessors.[4] The students sharing an apartment each had access to the entire apartment and the use of all common areas, such as the kitchen and living room.

Following an investigation, the city issued citations to the defendants on November 18 and 24, 2009, ordering them to cease and desist from operating unlicensed lodging houses. In January, 2010, when the defendants had not complied with the city's orders to reduce the number of occupants to no more than three unrelated adults in any one apartment, the city filed complaints in the Housing Court, seeking preliminary injunctions enjoining the defendants from failing to comply with the city's administrative orders, and from operating unlicensed lodging houses. Although there were no asserted violations of the sanitary or building codes, or of the zoning ordinance, the

---

[3]Paul F. and Diana H. Giorgio own the properties at 7 Clay Street and 13 Boyden Street; College Hill Properties, LLC, an entity controlled by Paul F. Giorgio, is the owner of the property at 11 Boyden Street; and Michele and Paul J. Meaney are the owners of the properties at 21 and 23 Caro Street.

[4]Although the record does not contain copies of any leases, the parties do not dispute that each of the students had a signed, twelve-month lease with one of the defendants.

city's stated basis for bringing the enforcement actions was its concern for fire safety and overcrowding.[5] Evidentiary hearings followed on the five individual complaints. Concluding that the apartments as occupied constituted "lodgings" under the act, the judge issued the requested preliminary injunctions and denied the defendants' motions to stay.

When the defendants did not comply with the temporary injunctions by reducing the number of occupants in each apartment, the city filed complaints for civil contempt. At that point, the students, some of whom were seniors, were preparing for final examinations and graduation. Their leases were due to expire on May 31, 2010, and they would not leave voluntarily in response to notices to quit dated March 31, 2010. Show cause hearings were conducted concerning each of the five properties on April 14, 2010.[6] The judge found the defendants in contempt and imposed monetary fines.[7] The defendants' motions to stay were denied. Judgments of contempt issued on April 26, 2010. Final judgments entered thereafter, permanently enjoining the defendants from "allowing more than three unrelated adults to reside in each legal dwelling unit." The defendants filed notices of appeal.[8]

At the defendants' request, the cases were consolidated for purposes of appeal. The Appeals Court affirmed the judgments, *Worcester* v. *College Hill Props., LLC*, 80 Mass. App. Ct. 757 (2011), and denied the defendant's petition for rehearing. We granted the defendants' application for further appellate review. Because we conclude that the dwelling units at issue do not

[5]Lodging houses are required, inter alia, to have sprinkler systems. See G. L. c. 148, § 26H.

[6]The defendants explained that, even where students had been offered dormitory placement, the college's housing administrator estimated that transition from an off-campus apartment to a dormitory room generally required at least one week to put in place. The judge suggested placing the students in a hotel; counsel sought a stay pending the end of the examination period on May 15.

[7]The calculated fine was based on a fine for each day that the defendants failed to reduce the number of occupants per apartment, pursuant to the preliminary injunction; the total amount of the fines for all of the properties was $17,900.

[8]At oral argument, counsel for the defendants represented that the defendants did not subsequently rent any of the apartments to four or more individuals.

meet the definition of "lodgings" under the lodging house act, the injunctions ordering the defendants to "reduce the number of unrelated adult occupants at the premises to no more than three in each legal dwelling unit" must be vacated.

2. *Discussion.* This case turns entirely on the meaning of the word "lodgings" under the lodging house act. The lodging house act was enacted approximately one hundred years ago, during World War I, largely in response to concerns about immoral conduct and the spread of venereal disease. *Newbury Jr. College* v. *Brookline,* 19 Mass. App. Ct. 197, 203-204 (1985); St. 1918, c. 259. See *Maher* v. *Brookline,* 339 Mass. 209, 215 (1959); G. L. c. 140, § 26. The act requires that a lodging house keeper obtain a license in order to operate a "lodging house." G. L. c. 140, § 24. General Laws c. 140, § 22, defines a "lodging house" as

> "a house where lodgings are let to four or more persons not within second degree of kindred to the person conducting it, and shall include fraternity houses and dormitories of educational institutions, but shall not include dormitories of charitable or philanthropic institutions or convalescent or nursing homes licensed under section seventy-one of chapter one hundred and eleven or rest homes so licensed, or group residences licensed or regulated by agencies of the commonwealth."[9]

Although the act provides a definition of a "lodging house," the word "lodgings" is not itself defined, either in that section

---

[9]"Fraternity houses and dormitories of educational institutions" were added to the definition on March 18, 1965, apparently in response to legislative concerns about college student unrest. St. 1965, c. 171. "The mid-1960's was a period of student radicalism, and it is not unreasonable to infer, given the historic purpose of the lodging house laws, that the legislative concern dwelt on what was going on inside college dormitories and who was supervising them. There is, thus, some support for the ruling of the trial judge that the purpose of the lodging house laws is to assure that the facilities defined in G. L. c. 140, § 22, will be orderly, law abiding operations, responsibly managed by appropriate persons, and that the facilities are safe, sanitary, and suitable for human habitation." *Newbury Jr. College* v. *Brookline,* 19 Mass. App. Ct. 197, 204 (1985). See St. 1965, c. 171. Prior to the 1965 amendments, the definition excluded "dormitories of charitable or philanthropic institutions or convalescent or nursing homes licensed under section seventy-one of chapter one hundred and eleven or rest homes so licensed." St. 1965, c. 171.

or anywhere else in the act. The city takes the view that the dwelling units in question are "lodgings" let to four or more unrelated adults, and that the two-family and three-family apartment buildings in which those dwelling units are located "have been adapted for use as lodging houses and fit into the plain meanings of the words 'house,' 'lodging' and 'let.' " In arriving at this interpretation, which the city contends is clearly and unambiguously apparent in the statute, the city relies primarily on the dictionary definitions of the words "house," "lodging," and "let," each considered separately.[10] It construes "a house in which lodgings are let" to mean any place to live in any house.

The defendants contend that this view is in essence myopic. The meaning accorded by the city to the terms "lodgings" and "lodging house" flies in the face of common understanding of the words as well as of an "apartment" within an "apartment building." The city, they maintain, ignores the historic distinction between lodging houses and apartments, the specific purposes for which the lodging house act was adopted, and the difference between lodgers and tenants long recognized in our statutory and case law. Adopting the city's interpretation would, the defendants argue, lead to absurd results and selective enforcement never envisioned or intended by the Legislature.

We review questions of statutory interpretation de novo. *Massachusetts Insurers Insolvency Fund* v. *Smith*, 458 Mass. 561, 564-565 (2010), quoting *Atlanticare Med. Ctr.* v. *Commissioner of the Div. of Med. Assistance*, 439 Mass. 1, 6 (2003). In interpreting the meaning of a statute, we look first to the plain statutory language. " 'Where the language of a statute is clear and unambiguous, it is conclusive as to legislative intent . . .' and 'the courts enforce the statute according to its plain wording . . . so long as its application would not lead to an absurd result.' " *Martha's Vineyard Land Bank Comm'n* v. *Assessors of W. Tisbury*, 62 Mass. App. Ct. 25, 27-28 (2004), quoting *Pyle*

---

[10]The city relies also upon *Worcester* v. *Bonaventura*, 56 Mass. App. Ct. 166, 169 (2002), in which the Appeals Court held that "a lodging house is clearly defined as a dwelling unit that is rented to four or more persons not constituting a family." That case, however, construed the Worcester zoning ordinance, which contained distinctive definitions of "dwelling" and "family" not found in the language of G. L. c. 140, §§ 22-32 (lodging house act).

v. *School Comm. of S. Hadley*, 423 Mass. 283, 285 (1996), and *Weitzel* v. *Travelers Ins. Co.*, 417 Mass. 149, 153 (1994). "All the words of a statute are to be given their ordinary and usual meaning, and each clause or phrase is to be construed with reference to every other clause or phrase without giving undue emphasis to any one group of words, so that, if reasonably possible, all parts shall be construed as consistent with each other so as to form a harmonious enactment effectual to accomplish its manifest purpose." *Selectmen of Topsfield* v. *State Racing Comm'n*, 324 Mass. 309, 312-313 (1949), and cases cited. "The Legislature must be assumed to know the preexisting law and the decisions of this court." *Id.*

"Where we are unable to ascertain the intent of the Legislature from the words of a statute, we look to external sources, including the legislative history of the statute, its development, its progression through the Legislature, prior legislation on the same subject, and the history of the times." *81 Spooner Rd. LLC* v. *Brookline*, 452 Mass. 109, 115 (2008). " '[A] statute must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated.' . . . Courts must ascertain the intent of a statute from all its parts and from the subject matter to which it relates, and must interpret the statute so as to render the legislation effective, consonant with sound reason and common sense." *Harvard Crimson, Inc.* v. *President & Fellows of Harvard College*, 445 Mass. 745, 749 (2006), quoting *Hanlon* v. *Rollins*, 286 Mass. 444, 447 (1934).

Because the word "lodgings" is not defined in the lodging house act, we look first to the common meaning of that term in ordinary usage. See *Harvard Crimson, Inc.* v. *President & Fellows of Harvard College, supra*; G. L. c. 4, § 6, Third. "A dictionary definition of 'lodging' is 'accommodation in a house, esp[ecially] in rooms for rent' and of 'lodging house,' 'a house in which lodgings are let, esp[ecially] a house other than an inn or hotel.' " *Selvetti* v. *Building Inspector of Revere*, 353 Mass.

645, 646 (1968), *S.C.*, 356 Mass. 720 (1969).[11] See Webster's New Universal Unabridged Dictionary 1129 (2003) (defining lodgings as "a room or rooms rented for residence in another's house"). "[A] mere lodger in the house of another is not a tenant. . . . [A] man who let rooms to lodgers was still the sole occupier of the house." *White* v. *Maynard*, 111 Mass. 250, 253 (1872).

Historically, the difference between "lodgings" and apartments has been described in terms of the differing legal interests of a lodger or a tenant in the property he or she occupies. During the term of a tenancy, a tenant has the exclusive legal right to occupy and use the entirety of the property; the rooms within the apartment are not rooms "in the house of another." By contrast, a lodger occupies only a specific room or rooms within a house or apartment that is itself owned or rented by someone else, where the owner, or another leasing from the owner, is the primary occupant of the property. See *White* v. *Maynard*, *supra* at 253, 255, quoting *Wilson* v. *Martin*, 1 Denio 602 (N.Y. Sup. Ct. 1845), where we explained:

> "[T]he owner or tenant of a dwelling-house was not a joint occupier with a lodger to whom he let the exclusive use of a bed-room and the joint use of a sitting-room . . . . 'This was nothing more than an agreement for board and lodging, with a designation of the particular rooms which the defendant was to occupy. It was not a contract for the

---

[11]In Sang Vo *vs.* Boston, U.S. Dist. Ct., No. OO CV-11733-RWZ, slip op. at 19 (D. Mass. Sept. 22, 2003), the United States District Court for the District of Massachusetts, in addressing the meaning of "lodgings" under the lodging house act, observed that, contrary to the city of Boston's view, "a rooming unit is not a dwelling unit, which is to say, an apartment is not synonymous with 'lodgings.' "

" 'A house where lodgings are let' simply mirrors the dictionary definition of 'lodging house.' See, e.g., Webster's New Collegiate Dictionary 670 (1979) ('a house where lodgings are provided and let'); Oxford English Dictionary Online (2003) (from the second print edition, 1989) ('A house, other than an inn or hotel, in which lodgings are let.') . . . . Although the Licensing Board defines 'lodgings' broadly as 'a place to live,' the more common and precise definition is 'a room in the house of another used as a place of residence.' Webster's, *supra*[] at 670. See also Webster's II New College Dictionary 644 (2001) ('[s]leeping accommodations' and 'rented rooms'); Oxford English Dictionary Online, *supra* ('A room or rooms hired for accommodation and residence in the house of another . . . .' " *Id.* at 17.

hiring and letting of real estate. When one contracts with the keeper of a hotel or boarding-house for rooms and board, whether for a week or a year, the technical relation of landlord and tenant is not created between the parties. The lodger acquires no interest in the real estate.' . . . [It was] an ordinary agreement for board and lodging in the plaintiff's boarding-house, by which the plaintiff, as keeper of the boarding-house, retained the legal possession, custody and care of the whole house and of every room therein."

That the Legislature has, in recent years, afforded lodgers certain additional rights, G. L. c. 186, § 17,[12] does not in any way alter the essential difference between a lodger and a tenant, the former having only a contractual interest, while the latter has a property interest. *Hall* v. *Zoning Bd. of Appeals of Edgartown*, 28 Mass. App. Ct. 249, 254 (1990), quoting Webster's Third New Int'l Dictionary 1329 (1971) ("A 'lodger' . . . 'acquires no property interest, or possession [in housing accommodations,] but only the right in accordance with the agreement to live in and occupy a room or other designated portion therein that still remains in the owner's legal possession.' . . . [T]he critical distinguishing feature of a 'lodger' is his lack of interest in real property and his contractual relationship with the owner"). See *Bech* v. *Cuevas*, 404 Mass. 249, 253-254 (1989) (noting that lodgers granted tenant-at-will status by virtue of G. L. c. 186, § 17, do not have rights coextensive with those of other tenants at will under G. L. c. 186, § 12). See also *Massachusetts Sober Hous. Corp.* v. *Automatic Sprinkler Appeals Bd.*, 66 Mass. App. Ct. 701, 708 (2006) (group home meets

---

[12]General Laws c. 186, § 17, provides, in relevant part:

"occupancy of a dwelling unit within premises licensed as a rooming house or lodging house, except for fraternities, sororities and dormitories of educational institutions, for three consecutive months shall constitute a tenancy at will; provided, however, that if the rent for occupancy in such premises is payable either daily or weekly, seven days written notice to the occupant shall be sufficient to terminate the tenancy where the tenant is committing or permitting to exist a nuisance in or is causing substantial damage to the rental unit, or is creating substantial damage to the rental unit, or is creating a substantial interference with the comfort, safety, or enjoyment of the landlord or other occupants of the accommodation."

definition of lodging house because, "[l]ike a traditional lodging or boarding house, it proposes to house a good number of unrelated men in a noninstitutional setting, in a residential neighborhood, in a large house with many bedrooms").

A distinction between "lodgings" and "apartments" is also evident throughout the Massachusetts sanitary code and the Massachusetts fire safety code, which each define separately a "rooming unit" and a "dwelling unit," and then promulgate separate and distinct standards for rooming units and dwelling units. See, e.g., 105 Code Mass. Regs. §§ 410.100, 410.150, 410.550 (2005). This regulatory scheme evinces a legislative understanding that a rooming unit is not the same as a dwelling unit and, thus, that "lodgings," whether under Statewide regulations or under the lodging house act, are not the same as apartments.

Under the State sanitary code, a "rooming unit" (which is located in "[b]oarding houses, hotels, inns, lodging houses, dormitories and other similar dwelling places") is defined as "the room or group of rooms let to an individual or household for use as living and sleeping quarters but not for cooking, whether or not common facilities for cooking are made available." 105 Code Mass. Regs. § 410.020 (2005). By contrast, a "[d]welling [u]nit means the room or group of rooms within a dwelling used . . . by one family or household for living, sleeping, cooking and eating. Dwelling unit shall also mean a condominium unit." *Id.*

The Massachusetts fire safety code defines "[b]oarding or [l]odging [h]ouses" as "[b]uildings in which separate sleeping rooms are rented providing sleeping accommodations for persons on either a transient or a permanent basis, with or without meals." "Apartment [h]ouses," by contrast, are defined as "[b]uildings containing six or more dwelling units with independent cooking and bathroom facilities." 527 Code Mass. Regs. § 24.03 (1998). The Massachusetts lead poisoning prevention code adopts essentially identical definitions to those in the Massachusetts sanitary code. See 105 Code Mass. Regs. § 460.020 (2002).

The distinction between "lodgings" and rental apartments is consistent with the definition of "lodging house" in G. L. c. 140, § 22, and with the role that a "lodging house" plays in the

over-all statutory structure. See *Massachusetts Hosp. Ass'n* v. *Department of Med. Sec.*, 412 Mass. 340, 346 (1992) ("We interpret the words used in a statute with regard to both their literal meaning and the purpose and history of the statute within which they appear").

The statutory definition of "lodging house" expressly includes "fraternity houses and dormitories of educational institutions." In fraternity houses and school dormitories, students by agreement, and without acquiring any property interest therein, occupy specific rooms with sleeping accommodations, much akin to a lodger in a traditional lodging house; in each instance, someone else has primary possession of, and a property interest in, the premises.

The expectation that "lodgings" consist of a specific room or rooms, and that the "lodging house" remains under the control and oversight of the person conducting it, is fundamental to the statutory scheme. Those conducting a "lodging house" must maintain a register containing the name of each person "engaging or occupying a private room," the room assigned to the occupant, and the date and time the room was assigned. G. L. c. 140, § 27. One who conducts a "lodging house" must obtain a license and comply with a substantial number of additional monitoring and reporting requirements.[13] Failure to do so may subject the person conducting the lodging house to both fines and criminal penalties.[14] See G. L. c. 140, §§ 24, 26, 27.

These licensing requirements, and the accompanying monitoring and recordkeeping, are consistent with the statutory purposes for which the lodging house act was adopted. The lodging house act, enacted during World War I, in conjunction with the war effort, was intended to address the Legislature's concerns with

---

[13]Pursuant to the State fire safety code, lodging and boarding houses with six or more occupants "not within the second degree of kindred" are also required to install "an adequate system of automatic sprinklers." G. L. c. 148, § 26H.

[14]Licensed lodging houses are "subject to inspection by the licensing authorities and their authorized agents, and by the police on request from the licensing authorities." G. L. c. 140, § 25. Lodging house keepers are also subject to a fine or imprisonment if they "knowingly permit[] the property under [their] control to be used for the purpose of immoral solicitation, immoral bargaining or immoral conduct." G. L. c. 140, § 26.

the use of lodging houses as a venue for immoral solicitation and to prevent other immoral conduct.

> "When the Senate Committee on Public Health reported out the bill which led to enactment of the legislation, it noted that the bill was a partial response to a letter from the State Department of Health urging, as part of the war effort, a campaign against venereal disease. That objective is conspicuous in the statutory text which imposes criminal penalties should a licensee: use a lodging house for immoral solicitation, immoral bargaining, or immoral conduct (G. L. c. 140, § 26); or knowingly permit occupation of a room of less than 400 square feet by a woman on different occasions within a period of thirty days with different men." (Footnote omitted.)

*Newbury Jr. College* v. *Brookline*, 19 Mass. App. Ct. 197, 203-204 (1985). See *Maher* v. *Brookline*, 339 Mass. 209, 215 (1959).

The lodging house act clearly intends persons conducting a lodging house to be of good moral character, and gives licensing authorities broad discretion in issuing lodging house licenses. It permits "licensing authorities" to suspend a lodging house keeper's license "for any cause deemed satisfactory to them," and to revoke a license if they "are satisfied that the licensee is unfit to hold the license." G. L. c. 140, § 30. See *Newbury Jr. College* v. *Brookline, supra* at 204 (noting with approval suggestion "that the purpose of the lodging house laws is to assure that the facilities defined in G. L. c. 140, § 22, will be orderly, law abiding operations, responsibly managed by appropriate persons, and that the facilities are safe, sanitary, and suitable for human habitation"). See also Sang Vo *vs.* Boston, U.S. Dist. Ct., No. OO-CV-11733-RWZ, slip op. at 21-22 (D. Mass. Sept. 22, 2003), citing *Newbury Jr. College* v. *Brookline, supra* at 203 ("The Lodging House Statute was enacted out of concern that the masses of young and unmarried people powering Boston's economy, many from the country or overseas and without family connections, were leading lonely, antisocial, sexually loose, or otherwise unhealthy lives").

Construing "lodgings" as the city suggests would lead to

absurd results and selective enforcement. The city argued during a hearing before the Housing Court judge, as it did before us, that a building with three dwelling units could contain some units that are "lodgings" and others that are apartments. Under the city's view, a three-unit building with four unrelated students in the first-floor apartment, five siblings of the lessor in the second-floor apartment, and seven children of the lessor in the third-floor apartment, would contain "lodgings" requiring a "lodging house" license only as to the first-floor dwelling unit, the unit housing the fewest occupants.[15] If the four students moved out, and a family of three moved in, the first-floor dwelling unit would transform from "lodgings" to a dwelling unit no longer subject to the lodging house act. This is an absurd result. "[B]y-laws must be construed reasonably . . . . [They] should not be so interpreted as to cause absurd or unreasonable results when the language is susceptible of a sensible meaning." (Citations omitted.) *North Shore Realty Trust* v. *Commonwealth*, 434 Mass. 109, 112 (2001), quoting *Green* v. *Board of Appeal of Norwood*, 358 Mass. 253, 258 (1970). See *Lexington* v. *Bedford*, 378 Mass. 562, 570 (1979).

Moreover, during argument before us, the city acknowledged that, under its interpretation of "lodgings," the lodging house act would apply to a family of seven renting an apartment from an unrelated landlord, and would apply if a new baby were added to a family of three, but asserted that the city would not enforce the statutory provisions in those circumstances. We will not adopt an interpretation of a statute which relies upon selective enforcement of the statutory provisions. Cf. *Commonwealth* v. *Lora*, 451 Mass. 425, 439-440 & n.27 (2008); *Cote-Whitacre* v. *Department of Pub. Health*, 446 Mass. 350, 376-377 (2006) (Spina, J. concurring).

While we recognize that the city seeks to protect student safety, and apparently regards the apartments at issue here as

---

[15]At a hearing before the Housing Court judge, the city's expert was pressed repeatedly to state whether, where all three units were "lodgings," a lodging house license would be required for each unit or if a single license for the building would suffice. He declined to respond, stating that he merely enforced the code and did not interpret it. He emphasized that, where one or more violations of the lodging house act exist in a building, the enforcement action is directed to the property address, rather than to a specific unit.

being the equivalent of dormitories, such concerns are better addressed through enforcement of applicable zoning ordinances and provisions of the sanitary and fire safety codes. The lodging house act, however, has no application in these circumstances. The apartments as occupied are not "lodgings" so as to render the defendants' properties lodging houses under G. L. c. 140, § 22, and the judgments enjoining the defendants from allowing four unrelated adults to occupy each of the apartments cannot stand.

The defendants argue also that the judgments of contempt should be reversed. "When it is decided by appellate reversal that the plaintiff was not originally entitled to any equitable relief, civil contempt adjudications fall with the orders violated." *Fitchburg* v. *707 Main Corp.*, 369 Mass. 748, 754 (1976). Because the city was not entitled to equitable relief, whether the contempt orders may be set aside thus turns on whether they were criminal or civil. See *id.*

Each of the city's complaints for contempt was styled, "Complaint for Civil Contempt." The judgments of contempt imposed a daily fine on the defendants for each day that they failed to comply with the injunctions. "[T]he purpose of civil contempt is remedial: its aim is to coerce the performance of a required act by the disobedient party for the benefit of the aggrieved complainant." *Sodones* v. *Sodones*, 366 Mass. 121, 129 130 (1974). By contrast, "[t]he purpose of criminal contempt . . . is punitive: its aim is to vindicate the court's authority and to punish the contemnor for doing a forbidden act or for failing to act as ordered." *Matter of Birchall*, 454 Mass. 837, 848 (2009), quoting *Sodones* v. *Sodones*, *supra* at 130.

Here, the fines were intended to coerce the defendants into complying with the court's orders to reduce the number of occupants in each unit, and to pay for the costs of enforcement of those orders. "The primary objective of an order imposing a prospective daily fine is to coerce and, as such, it relates to civil contempt." *Labor Relations Comm'n* v. *Fall River Educators' Ass'n*, 382 Mass. 465, 476 (1981). Accordingly, the judgments of contempt here were clearly civil in nature, and must be vacated.

3. *Conclusion.* The judgments enjoining the defendants from allowing four unrelated adults to occupy each of the apartments

are vacated and set aside. The judgments of contempt are vacated, and judgment shall enter for the defendants on the plaintiff's complaints for contempt.

*So ordered.*