C.A.D. BUILDERS LLC vs. CITY OF BOSTON ZONING BOARD OF APPEAL, PS 20-000125

































 
 C.A.D. BUILDERS LLC, Plaintiff, v. CITY OF BOSTON ZONING BOARD OF APPEAL, acting by and through its members CHRISTINE ARAUJO, MARK FORTUNE, MARK ERLICH, BRUCE BICKERSTAFF, CRAIG GALVIN, TYRONE KINDELL, JR., KERRY WALSH LOGUE, EDWARD DEVEAU, JOSEPH RUGGIERO, and NADINE FALLON; and ONSITE BUILDERS & DEVELOPMENT, LLC, Defendants
 PS 20-000125 
 OCTOBER 7, 2021
SUFFOLK, ss.
VHAY, J.
DECISION AND ORDER














 In October 2019, the defendant members of the City of Boston Zoning Board of Appeal (the "Board") granted defendant Onsite Builders & Development, LLC's ("Onsite") applications for two variances. The variances allow Onsite to build a 40-unit rental development, on the northeast side of Heron Street in Boston's West Roxbury neighborhood (the "11 Heron Project"); and a 32-unit condominium development, on the southwest side of Heron Street (the "26 Heron Project"). Eleven Heron Street is on the east side of Heron Street, across from 26 Heron Street. The Board granted separate variances for each project; this Decision will call them, respectively, the "11 Heron Variance" and the "26 Heron Variance." 





 Plaintiff C.A.D. Builders, LLC ("C.A.D.") timely appealed the variances, to the Suffolk County Superior Court, under § 11 of the Boston Zoning Enabling Act, St. 1956, c. 665, § 11, as amended through St. 1994, c. 461, § 2 (the "Boston Enabling Act"). C.A.D. owns 7.75 acres of vacant land (the "Extension") near the sites of Onsite's projects. C.A.D. argues that by granting the Variances, the Board hurt C.A.D.'s chances of turning its Extension into a 29-lot residential subdivision. 





 Onsite caused C.A.D.'s appeal to be transferred to the permit session of this Court. See G.L. c. 185, § 3A. Onsite has moved for summary judgment on all of C.A.D.'s claims. Onsite argues that C.A.D. lacks standing under the Boston Enabling Act to challenge the Variances. This Court DENIES Onsite's motion, as there are disputed facts concerning C.A.D.'s standing (or lack thereof). [Note 1] 





 Here are the undisputed background facts, first with respect to the Extension and its neighborhood. The Extension is surrounded by a quarry (to the west), Washington Street (to the south), the rear of various properties along the west side of Heron Street (to the east); and Willet and Thrush Streets (to the north). [Note 2] Willet Street is a private way open to the public. It's a dead end street, connecting only to Thrush Street. There are single-family homes along both Willet and Thrush Streets. 





 The Extension's on a hill that peaks at just over 243 feet in elevation. C.A.D. proposes to subdivide the Extension into 29 lots, along three subdivision roads. Those roads include an extension of Willet Street (that's why the project's called the "Extension"). After construction, extended Willet Street will continue to be a dead end. No part of the Extension or its subdivided lots will share a property line with, or connect to, Heron Street. (Like Willet Street, Heron Street is a private way open to the public. It's also a dead-end street, with access to only Washington Street, which lies southeast of Heron Street. There is no direct pedestrian or vehicular connection between Heron and Willett Streets: Heron connects only to Washington, and Willett connects only to Thrush.) 





 No part of the Extension shares a property line with the site of the 11 Heron Project. That's not the case with the 26 Heron Project. Once the Extension is subdivided, its Lots R and S will abut the 26 Heron Project. (The entire rear lot line of Lot S, and a part of Lot R's rear lot line, will border the 26 Heron Project.) The distance from the rear of the proposed residence on Lot S (the closest one in the Extension to the 26 Heron Project) to the nearest building approved for the 26 Heron Project is between 75 and 85 feet. The distance from the rear lot line of Lot S to the nearest building approved for the 11 Heron Project is 130 feet; the distance from the rear of the home proposed for Lot S to that same building is 215 feet. 





 At the time Onsite moved for summary judgment, C.A.D. was nearing completion of the Extension's roads, but had yet to build any homes. C.A.D. also had installed all utilities for the Extension except electricity. But the Extension contains vegetated wetlands. A large one is on the side of the Extension near the quarry, but Lots R and S, those abutting the site of the 26 Heron Project, contain wetlands too. It turns out that fifteen proposed Extension lots are within a regulated 100-foot buffer zone of vegetated wetlands. At the time Onsite moved for summary judgment, C.A.D. hadn't sought approvals or permits from the Boston Conservation Commission to build in the wetlands or their buffer zones. C.A.D. also hadn't received any building permits for homes in the Extension, hadn't begun advertising homes for sale, hadn't notified City authorities (as required under C.A.D.'s approvals) of which Extension lots would be the site of affordable units, and hadn't started construction of any foundations or buildings. 





 The Extension and the sites of Onsite's projects are in the West Roxbury Neighborhood Zoning District under art. 56 of the Boston Zoning Code (the "Code"). The lots in the Extension that are proposed to be along Willet Street are in a "1F-6000" zone under the Code, which is part of one of the West Roxbury Neighborhood's residential subdistricts. Four of the 11 Heron Project's parcels, and all parcels in the 26 Heron Project, are likewise zoned 1F-6000. Some lots in the Extension are in a "Conservation Protected Subdistrict." One 11 Heron Project parcel is zoned "Multi-Family Residential" (or "MFR"). 





 The law governing a party's standing under § 11 of the Boston Enabling Act to challenge a decision of the Board is identical to that controlling who may lawfully appeal local zoning board decisions under the Zoning Act, G.L. c. 40A, § 17. See Porter v. Board of Appeal of Boston, 99 Mass. App. Ct. 240 , 241 (2021). Accordingly, a person who is one of the "parties in interest" as defined by c. 40A, § 11, is presumed to have standing under § 11 of the Boston Enabling Act. See Porter, 99 Mass. App. Ct. at 241. Chapter 40A, § 11 defines "parties in interest" as 





 the petitioner, abutters, owners of land directly opposite on any public or private street or way, and abutters to the abutters within three hundred feet of the property line of the petitioner as they appear on the most recent applicable tax list, notwithstanding that the land of any such owner is located in another city or town, the planning board of the city or town, and the planning board of every abutting city or town. 





 Onsite begins its attack on C.A.D.'s standing by arguing that, with respect to the 11 Heron Variance, C.A.D. isn't a "party in interest." As will become clearer later, this issue isn't critical to deciding whether Onsite wins on summary judgment, but it will be an important issue at trial, as it dictates which party has the initial burden of proof on the issue of C.A.D.'s standing with respect to the 11 Heron Project. So the Court will start its analysis of Onsite's motion by looking at whether, with respect to the 11 Heron Project, C.A.D. is a "party in interest." 





 This Court ruled in Arena v. Williams, 27 LCR 132 , 133 (2019) (Vhay, J.), aff'd sub nom. Arena v. Town of Nantucket, 96 Mass. App. Ct. 1116 (2020), that an "abutter" under c. 40A, § 11, is a property owner who shares a boundary line with the site of the development that benefits from whatever approval the alleged abutter hopes to challenge. C.A.D. concedes the Extension doesn't abut any part of the site of the 11 Heron Project, nor does C.A.D. own property on Heron Street that's "directly opposite" the 11 Heron site. C.A.D. also admits it doesn't own property that abuts another property that, in turn, abuts the 11 Heron site. 





 Hoping to gain a presumption of standing to challenge the 11 Heron Variance, C.A.D. makes two arguments. C.A.D. first contends that the Extension abuts the site of the 26 Heron Project. That site's across Heron Street from the 11 Heron Project; C.A.D. argues that's close enough for purposes of § 11. Arena rejects that contention, holding that one can't ignore intervening streets when deciding who's an "abutter-to-an-abutter" under c. 40A, § 11. See Arena, 27 LCR at 133. C.A.D. hasn't convinced the Court that it wrongly decided Arena. 





 C.A.D. bases its second argument on c. 40A, § 11's wording. Recall that § 11 describes "parties in interest" as "abutters, owners of land directly opposite on any public or private street or way, and abutters to the abutters within three hundred feet of the property line of the petitioner. . . ." (Emphasis added.) C.A.D. observes that § 11 doesn't say where the petitioner's "property line" needs to be. And since it's undisputed that the Extension abuts Onsite's 26 Heron site (which everyone agrees gives C.A.D. a presumption of standing with respect to the 26 Heron Project), C.A.D. contends that, accordingly, it must be presumed to have standing for Onsite's 11 Heron Project. 





 The Court rejects C.A.D.'s interpretation of c. 40A, § 11. The Court construes the phrase "property line of the petitioner" in § 11 to mean a line associated with the property that's the subject of the petitioner's application. It's true that when a court is interpreting statutes like § 11, the court must "'look first to the plain statutory language.'" Porter, 99 Mass. App. Ct. at 245, quoting Worcester v. College Hill Props., LLC, 465 Mass. 134 , 138 (2013). But a court also is obliged to read "'each clause or phrase . . . with reference to every other clause or phrase without giving undue emphasis to any one group of words, so that, if reasonably possible, all parts shall be construed as consistent with each other so as to form a harmonious enactment effectual to accomplish its manifest purpose." College Hill Props., 465 Mass. at 139, quoting Selectmen of Topsfield v. State Racing Comm'n, 324 Mass. 309 , 312-313 (1949). The court also must avoid interpreting statutes in a manner that would lead to an absurd result. See College Hill Props., 465 Mass. at 138; Porter, 99 Mass. App. Ct. at 245. 





 Looking at the entire definition of "parties in interest," this Court concludes that c. 40A, § 11's phrase "property line of the petitioner" is shorthand for "property line of the property that is the subject of the petitioner's application." The Court reaches this conclusion for two reasons. First, the common feature of each of the "parties in interest" in § 11 (the petitioner, the abutters and abutters-to-the-abutters, and the planning boards of the municipality and abutting municipalities) is that they have an interest in the property that is the subject of a zoning application, and not necessarily an interest in the person who filed that petition. Construing "property line of the petitioner" as limited to the property that's the subject of a zoning application treats equally every "party in interest" whose status as such depends on their proximity to the site of what the petitioner proposes to do. 





 Second, limiting the term "property line of the petitioner" to the property that's the subject of the petitioner's zoning application avoids having the number of "parties in interest" turn not on the location and characteristics of the property (the chief concerns of most zoning laws), but instead on the fortuity of who owns the property, something that zoning laws don't usually regulate. Under C.A.D.'s reading of c. 40A, § 11, if Onsite were a multinational development company, one that owned properties all over the world, Onsite would be obligated under the Boston Enabling Act to give to every abutter of those properties - worldwide - notice of Onsite's application for the Heron Street Variances. That is an absurd result. Moreover, other language in § 11 suggests the legislature couldn't have intended that result: the sentence that follows § 11's definition of "parties in interest" states: "The assessors maintaining any applicable tax list shall certify to the permit granting authority or special permit granting authority the names and addresses of parties in interest and such certification shall be conclusive for all purposes." That provision is workable if "property line of the petitioner" means only the property that's the subject of the petitioner's zoning application. It's less functional if every assessor (in the Commonwealth? in the United States? in the world?) has to search its data for every property owned by the petitioner, then determine (and certify to a local board sitting in Massachusetts) who abuts those properties. 





 So C.A.D. is presumed to have standing under the Boston Enabling Act to challenge the 26 Heron Variance, but not the 11 Heron Variance. Onsite next mines the c. 40A, § 17 caselaw for a different attack on C.A.D.'s standing: that C.A.D.'s claims of harms are too speculative, as C.A.D. hasn't built anything in the Extension other than roads.





 Under both the Boston Enabling Act and the Zoning Act, a private individual may not challenge a zoning-board approval unless that individual is a "party aggrieved." See Porter, 99 Mass. App. Ct. at 241. To be a "party aggrieved" (and as noted earlier, "parties in interest" are presumed to have such aggrievement), the individual must "assert 'a plausible claim of a definite violation of a private right, a private property interest, or a private legal interest."" Standerwick v. Zoning Bd. of Appeals of Andover, 447 Mass. 20 , 27 (2006), quoting Harvard Sq. Defense Fund, Inc. v. Planning Bd. of Cambridge, 27 Mass. App. Ct. 491 , 493 (1989) (construing "party aggrieved" standard under G.L. c. 40B, § 21). Medeiros v. Baldwin Brothers, Inc., 17 LCR 471 (2009), holds that theoretical developments (as opposed to occupied properties) don't necessarily meet the "plausible claim of a definite violation" test. In Medeiros, Justice Grossman concluded that a developer of affordable housing lacked standing to challenge a special permit for a neighboring large office/commercial use. The housing developer claimed the latter use would reduce the town's sewer capacity, and thus make it harder for the housing development to proceed. On summary judgment, Justice Grossman held that the housing developer couldn't rest his claims of harm on the projected lack of sewer capacity because (a) he hadn't proved that the town's sewer system was at or above capacity, and (b) he had no present right to such capacity, having not applied for a sewer connection. The court observed in connection with the latter ruling that the housing developer's parcel was vacant, that his permitting of the development was incomplete, and that he lacked a final development plan. The court thus held that the developer's claims of harm hadn't ripened. See id. at 481-482. 





 Onsite argues that, as of the time it moved for summary judgment, C.A.D. didn't have complete approvals to build the Extension. Onsite thus contends that, under Medeiros, C.A.D. shouldn't be able to complain of the Onsite projects' alleged effects upon the Extension. C.A.D. argues the opposite. Citing several cases (Skyline Homes, Inc. v. Commonwealth, 362 Mass. 684 , 686-687 (1972); Clifford v. Algonquin Gas Trans. Co., 413 Mass. 809 , 814-816 (1992); and Douglas Env. Assocs., Inc. v. Department of Environmental Protection, 429 Mass. 71 , 75-76 (1999)), C.A.D. contends that private individuals properly may assert standing to file zoning appeals based on anticipated harms to their interests in hypothetical developments. The trouble with C.A.D.'s argument is that all of its cases arise under G.L. c. 79, § 12, one of the Commonwealth's eminent-domain statutes. Section 12 provides for damages for property taken by eminent domain "at the value thereof before the recording of the order of taking. . . ." The courts have interpreted that phrase to mean "fair market value," that is, the "'highest price which a hypothetical willing buyer would pay to a hypothetical willing seller in an assumed free and open market.'" Tigar v. Mystic River Bridge Auth'y, 329 Mass. 514 , 517 (1952), quoting Epstein v. Boston Housing Auth'y, 317 Mass. 297 , 299 (1944). Thus, C.A.D.'s cases show only that c. 79, § 12 embraces hypothetical developments; Standerwick and its progeny do not. 





 This Court thus won't give those who own vacant land, and who appeal their neighbor's zoning approvals under either the Boston Enabling Act or the Zoning Act, the ability to assert standing based on harms to whatever hypothetical development the appellant imagines. On the other hand, Onsite's contrary position - that owners of vacant land never have standing to appeal a zoning decision - goes too far. Medieros refused to go there. See Medieros, 17 LCR at 482 n. 81. A fairer application of Medieros, one that's consistent with Standerwick's objective of identifying "plausible claim[s] of a definite violation of a private right, a private property interest, or a private legal interest," is to limit the standing of owners of vacant lots to those who can establish harms to as-of-right development of their lots: that is, development that the owner could undertake without obtaining anything other than a building permit or similar approvals. That's because, under Massachusetts law, "[a] landowner has a right to improve his premises by the erection and use of buildings thereon where he complies with the existing statutes and ordinances, and he is entitled to whatever permits may be necessary to enable him to exercise this right." Fellsway Realty Corp. v. Building Comm'r of Medford, 332 Mass. 471 , 472 (1955). Plausible harms to an as-of-right development of a vacant parcel thus can form the basis for a party's standing under the Boston Enabling Act and the Zoning Act. 





 Where does that conclusion leave Onsite's motion for summary judgment? In making its "vacant property" challenge to C.A.D.'s standing, Onsite's Land Court Rule 4 statement of material facts focuses on C.A.D.'s lack of permits for the complete 29-lot subdivision of the Extension, rather than what C.A.D. could build as of right. The Court also can't determine from the parties' Rule 4 submissions which lots C.A.D. indisputably has the right to build upon, what sort of structures C.A.D. indisputably could build as of right on those lots, or what sort of harms (if any) those as-of-right structures would suffer from Onsite's projects. Since Onsite has the burden of overcoming C.A.D.'s presumed standing with respect to the 26 Heron Project, Onsite's failure to demonstrate the lack of that Project's effects upon an as-of-right development within the Extension dooms Onsite's vacant-land challenge to C.A.D.'s standing, at least for now. 





 The result's the same with respect to the 11 Heron Project. While (since it lacks a presumption of standing with respect to that project) C.A.D. bears the initial burden of establishing its standing to challenge it, even on summary judgment, see 81 Spooner Road, LLC v. Zoning Bd. of Appeals of Brookline, 461 Mass. 692 , 700-701 (2012), at oral argument on Onsite's motion, C.A.D. contended (and Onsite didn't dispute) it's entitled to build something residential within the Extension. That's a reasonable assumption: after all, the Extension contains 7.75 acres, and it's in a residential subdistrict. Onsite's Rule 4 submissions contain no evidence that the entire Extension is subject to the jurisdiction of the Conservation Commission or some other authority that could veto the Extension's development. C.A.D. also has presented enough evidence on summary judgment to suggest that development of the 11 Heron Project will adversely affect the "character" of the Extension's neighborhood, and in turn reduce the Extension's property values. While diminished property values, in and of themselves, usually can't support a party's claim of standing to challenge a development permit, a party may cite diminished values as part of his or her case for standing if they are "derivative of or related to cognizable interests protected by the applicable zoning scheme." Kenner v. Zoning Bd. of Appeals of Chatham, 459 Mass. 115 , 123 (2011), quoting Standerwick, 447 Mass. at 31-32. Section 7-3 of the Boston Zoning Code, "Conditions Required for Variance," provides the required connection, that of protecting the Extension's neighborhood. Section 7-3 states (emphases added) [Note 3]: 





 The Board of Appeal shall grant a variance only if it finds that all of the following conditions are met: 





 (a) That there are special circumstances or conditions, fully described in the findings, applying to the land or structure for which the variance is sought (such as, but not limited to, the exceptional narrowness, shallowness, or shape of the lot, or exceptional topographical conditions thereof) which circumstances or conditions are peculiar to such land or structure but not the neighborhood, and that said circumstances or conditions are such that the application of the provisions of this code would deprive the appellant of the reasonable use of such land or structure; 





 (b) That, for reasons of practical difficulty and demonstrable and substantial hardship fully described in the findings, the granting of the variance is necessary for the reasonable use of the land or structure and that the variance as granted by the Board is the minimum variance that will accomplish this purpose; 





 (c) That the granting of the variance will be in harmony with the general purpose and intent of this code, and will not be injurious to the neighborhood or otherwise detrimental to the public welfare; and 





 (d) That, if the variance is for a Development Impact Project, as defined in Section 80B-7, the applicant shall have complied with the Development Impact Project Exaction Requirements set forth in Section 80B-7.3, except if such variance is for a deviation from said requirements. 





 In determining its findings, the Board of Appeal shall take into account: 





 (1) the number of persons residing or working upon such land or in such structure; 





 (2) the character and use of adjoining lots and those in the neighborhood; and 





 (3) traffic conditions in the neighborhood. 





 Zoning provisions that expressly require a board to consider a neighborhood's "character" before granting or denying a permit signal that neighborhood character is a protected interest. See Monks v. Zoning Bd. of Plymouth, 37 Mass. App. Ct. 685 , 688 (1994). Monks further holds that such requirements give individuals living in the affected neighborhood the right to assert standing if they can show losses resulting from changes to the neighborhood's character. C.A.D. has provided evidence on summary judgment that the Extension will be worth less if Onsite's projects are built. While that evidence speaks to the value of the overall Extension, and the effect of both Onsite projects on the overall Extension, that's enough to get C.A.D. past Onsite's standing challenges as they pertain to the 11 Heron Project. See Attorney General v. Bailey, 386 Mass. 367 , 371 (1982) (court must construe summary-judgment record in light most favorable to non-moving party). C.A.D. nevertheless will have the initial burden at trial of showing how construction of the 11 Heron Project, by itself, will alter the character of the neighborhood enough to result in plausible harm to an as-of-right development within the Extension. 





 The Court thus concludes from the evidence and arguments presented on summary judgment that this case requires a trial concerning, at a minimum, C.A.D.'s standing. The Court ORDERS the parties to appear by telephone for a pretrial conference on November 5, 2021, at 2:30 P.M. A separate notice of pretrial conference will issue. 





SO ORDERED. 





FOOTNOTES
[Note 1] This is one of two decisions that address Onsite's motion for summary judgment. This Decision and Order is intended for publication, and one should read it before reading the other decision (dubbed "Further Decision"). 

[Note 2] This sentence greatly simplifies the location of the Extension and takes liberties with compass directions, but the parties agree on what this sentence says, so the Court won't quibble. 

[Note 3] C.A.D.'s opposition brief refers to § 7-3, but C.A.D. didn't file in support of its opposition an affidavit that presents § 7-3's text. The Court found the text cited in this decision at https://library.municode.com/ma/boston/ codes/redevelopment_authority?nodeId=ART2ADEAPNEDIAR80DEREAP. The Court relies on this text only for purposes of this Decision; if any of the parties believes this Decision relies on the wrong text, the Court ORDERS that party to move by October 15, 2021 for reconsideration of this point. Moreover, if C.A.D. wishes to rely on § 7- 3 at trial, it will have to present proper evidence. See Massachusetts Guide to Evidence, § 202(c) ("A court is not permitted to take judicial notice of municipal ordinances. . . ."). 


 
 Home/Search 
 Land Cases by Docket Number
 Land Cases by Date 
 Land Cases by Name
 


 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.